IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

KHAJAVIUS MITCHELL (1)
GARY SARTOR (4)
TYRONE CLARK (5)
MICHAEL JACKSON (8)
ERICK BALCAZAR (24)

     Defendants.

CRIMINAL ACTION FILE NO.

1:16-CR-427-AT-JKL

## NON-FINAL REPORT AND RECOMMENDATION

This Report and Recommendation addresses the following motions to suppress evidence that the government seized as a result of state and federal wiretap orders:

- Defendant Khajavius Mitchell's Motion to Suppress Wiretap Evidence [Doc. 779];

- Defendant Gary Sartor's Preliminary Motion to Suppress Wiretap Evidence [Doc. 526] and his perfected Motion to Suppress Wiretap Evidence [Doc. 590];

- Defendant Tyrone Clark's Amended Motion to Suppress Wiretap Evidence [Doc. 747];

- Defendant Michael Jackson's Preliminary Motion to Suppress All Conversation and Evidence Seized on (TT3) Pursuant to Court Ordered Electronic Interceptions [Doc. 607] and his Motion to Suppress Wiretap Evidence [Doc. 827]; and

- Defendant Erick Balcazar's Particularized Motion to Suppress Conversation and Evidence Seized Pursuant to Court Ordered Electronic Interceptions [Doc. 702] and his Amended Motion to Suppress Conversations and Evidence Seized Pursuant to Court Ordered Electronic Interceptions [Doc. 797].

The government has responded to these motions. [Docs. 873, 996.] The following Defendants have filed replies: Michael Jackson [Doc. 958], Khajavius Mitchell [Doc. 966], and Erick Balcazar [Doc. 980].

The Court organizes its discussion as follows. In Part I, the Court provides a brief summary of the state and federal wiretaps at issue in the pending motions. In Part II, the Court summarizes the procedural posture of the pending motions. In Part III, the Court addresses the issue of standing—*i.e.*, whether and to what extent

2

each of the above Defendants has demonstrated he is an "aggrieved person" able to challenge the wiretaps at issue.  In Part IV, the Court analyzes the substantive challenges to the wiretaps, namely, whether the wiretap applications failed to establish probable cause; (2) whether the applications failed to demonstrate necessity; and (3) whether the interceptions were properly sealed following termination of the wiretap orders.

For the reasons that follow, it is **RECOMMENDED** that the above motions be **DENIED**.

# I.     BACKGROUND

## A.     Applicable Standards

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et seq.* ("Title III" or the "Wiretap Act"), regulates the government's interception and disclosure of electronic surveillance or "wiretaps." *See United States v. Degaule*, 797 F. Supp. 2d 1332, 1346 (N.D. Ga. 2011) (citation omitted), *report and recommendation adopted*, *id.* at 1344.  Under Title III, an "aggrieved person"[1] can "move to suppress the contents of any wire or oral

---

[1] Under Title III, an "aggrieved person" is someone "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C.A. § 2510(11).

3

communications intercepted pursuant to [Title III], or evidence derived therefrom, on the grounds that—(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."  18 U.S.C. § 2518(10).   Wiretap orders are presumptively valid, and a defendant moving to suppress wiretap evidence "has the burden of overcoming this presumption and of proving that the wiretap order was unlawfully obtained."  *United States v. Flores*, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *22 (N.D. Ga. Sept. 27, 2007) (collecting cases), *report and recommendation adopted, id.* at *1-15.  Georgia's wiretap application requirements are co-extensive with Title III.  *See* O.C.G.A. § 16-11-64(c)[2]; *United States v.*

---

[2] O.C.G.A. § 16-11-64(c) provides:

> Upon written application, under oath, of the district attorney having jurisdiction over prosecution of the crime under investigation or the Attorney General made before a judge of superior court having jurisdiction over the crime under investigation, such court may issue an investigation warrant permitting the use of a device for the surveillance of a person or place to the extent the same is consistent with and subject to the terms, conditions, and procedures provided for by 18 U.S.C. Chapter 119.  Such warrant shall have state-wide application and interception of communications shall be permitted in any location in this state.

4

*Mayfield*, No. 2:16-CR-009-RWS-JCF, 2017 WL 9477736, at *8 (N.D. Ga. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 4330369 (N.D. Ga. Sept. 29, 2017).

Title III sets out numerous requirements that wiretap applications and orders must meet to be valid, and three of those requirements are pertinent to Defendants' arguments here.  First is the requirement that wiretap orders must be supported by probable cause.  *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) (citing *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978)); *see also* 18 U.S.C. § 2518(1)(b) ("[a wiretap] application must include a full and complete statement of the facts and circumstances relied upon by the applicant . . . including . . . details as to the particular offense that has been, is being, or is about to be committed . . . .").  The probable cause necessary to support a wiretap is the same as for a search warrant—*i.e.,* the issuing judge must "make a 'practical, common-sense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that the sought-for evidence will be obtained."  *Nixon*, 918 F.2d at 900 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  A reviewing court gives "great deference" to the issuing judge's probable cause finding, reviewing the decision "'simply to ensure that the [issuing judge] had a "substantial basis for

. . . conclud[ing]" that probable cause existed.'" *Id.* (quoting *Gates*, 462 U.S. at 238-39 and *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982)) (alterations supplied).

Second is the "necessity requirement," which requires that the application for a wiretap order contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). If, based on a wiretap application, the issuing judge determines that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," the wiretap may be authorized. *Id.* at § 2518(3)(c). "The affidavit must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. However, the government is not required to comprehensively exhaust all possible investigative techniques before applying for a wiretap." *United States v. Harrell*, 635 F. App'x 682, 685 (11th Cir. 2015) (citing *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010) and *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986)). This is because the purpose of the necessity requirement is simply "to ensure that electronic surveillance is neither routinely

6

employed nor used when less intrusive techniques will succeed." *Van Horn*, 789 F.2d at 1496; *see also United States v. Giordano*, 416 U.S. 505, 515 (1974) (explaining that Title III's requirements are to ensure that wiretaps "were not routinely employed as the initial step in criminal investigation"); *Degaule*, 797 F. Supp. 2d at 1358 and n.20 (citations omitted) (discussing that the "government's showing on necessity must be read in a practical and commonsense fashion," to accomplish the "narrow" purpose of ensuring wiretaps were not used "as the initial step in criminal investigations").

Third is the sealing requirement—that "[i]mmediately upon the expiration of the period of the order" the government make the recordings of intercepted communications available to the judge who authorized the wiretap and that the recordings be "sealed under his directions." 18 U.S.C. § 2518(8)(a). The Eleventh Circuit has defined "immediately" for purposes of Section 2518(8)(a) as within one to two days after interception ceases. *United States v. Matthews*, 431 F.3d 1296, 1307 (11th Cir. 2005). Absent "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof," the communications may not be used in evidence. 18 U.S.C. § 2518(8)(a) (cross-referencing 18 U.S.C. § 2517(3)); *see also United States v. Ojeda Rios*, 495 U.S.

257, 260 (1990) (describing Section 2518(8)(a) as having "an explicit exclusionary remedy for noncompliance with the sealing requirement") (footnote omitted).

### B.    The State Wiretaps on Target Telephones 1 Through 7

On January 28, 2016, Gwinnett County Superior Court Judge George F. Hutchinson III issued an order authorizing the interception of wire and electronic communications over three telephones for a period of 30 days:

(1)    a telephone with the number 404-205-3134, allegedly used by codefendant Gordon Evans (Gwinnett Target Telephone ("GTT") 1);

(2)    a telephone with the number 404-623-5727, allegedly used by Durell Leeshon Lewis (GTT2); and

(3)    a telephone with the number 678-464-5331, also allegedly used by Lewis (GTT3).

(*See* Order Authorizing the Interception of Wire Communications dated Jan. 28, 2016 at 3-4 [Doc. 877 Ex. 1; Doc. 1026 at 1-17][3]; *see also* Aff. of Paul Szabo in

---

[3] The government originally filed copies of the wiretap orders and applications relevant to the pending motions on a compact disc, which has been filed under seal at Docket Entry 877.  The disc contains 18 exhibits.  Since then, the government has also filed the exhibits separately under seal at Docket Entry 1026.  The Court refers to specific exhibits using the following convention: "Doc. 877 Ex. __ and Doc. 1026-__ at __".

Support of Wiretap TT1 ("TT1 Aff.") ¶ 19 [Doc. 877 Ex. 2 at 28-98; Doc. 1026 at 45-115].[4])  After the warrants were executed, law enforcement determined that the service plans for GTT1 and GTT2 had been recently cancelled and the phones were no longer active; thus, no relevant communications were intercepted over GTT1 or GTT2.  (TT1 Aff. ¶ 19.)  Interception over GTT3—allegedly belonging to Lewis— began on January 29, 2016 and continued to February 16, 2016.  Defendants Clark and Evans, as well as one other target subject who has not been charged in this case were intercepted.  (*Id.*)

On February 2, 2016, Judge Hutchinson granted an application to amend the January 28, 2016 Order to authorize the interception of communications over:

(4)     a telephone with the number 678-887-2540 (GTT4) allegedly used by Dossie Mann;

(5)     a telephone with the number 678-832-3114 (GTT5), allegedly used by Defendant Clark.[5]

---

[4] The Affidavit of FBI Special Agent Paul Szabo, dated August 2, 2016, supporting a federal wiretap for Target Telephone 1 ("TT1") provides a history of the applications for state court wiretaps relating to this case.  [*See* Doc. 877 Ex. 2.]

[5] A copy of the February 2, 2016 Order Granting the State's First Application to Amend an Order Authorizing the Interception of Wire Communication is docketed at Doc. 877 Ex. 3.

(TT1 Aff. ¶ 20.)  Defendants Evans, Clark and Sartor were intercepted over GTT4, and Defendants Evans, Clark, Michael Jackson, Mitchell, and Sartor were intercepted over GTT5.  (*Id.*)  Interception over TT4 and TT5 began on February 2, 2016, and ceased on February 16, 2016.  (*Id.*)

On February 4, 2016, Judge Hutchinson authorized interception of communications over 762-333-5400 (GTT6), a phone allegedly used by codefendant Evans.  (TT1 Aff. ¶ 21.)  Interception over GTT6 occurred only on February 4, 2016, and both Defendants Evans and Clark were intercepted.  (*Id.*)  In a separate order also dated February 4, 2016, Judge Hutchinson authorized interception of communications over 718-737-8836 (GTT7), a phone believed to be used by codefendant Evans.  (*Id.* ¶ 22.)  Interception began on February 4, 2016 and ceased on February 16, 2016.  Among others, Defendants Evans, Clark, Michael Jackson, Mitchell, and Sartor were intercepted over GTT7.  (*Id.*)

### C.    The Federal Wiretaps on Three Target Telephones

#### 1.    Initial Wiretap Application for Target Telephone 1

On August 2, 2016, upon application and a 71-page affidavit submitted by Special Agent ("SA") Szabo, United States District Judge Eleanor L. Ross entered an order authorizing the interception of wire communications over a cellular

telephone with number 404-630-4248 ("TT1").[6]  Interceptions began on August 4, 2016, and ceased on Friday, September 2, 2016.  [*See* Doc. 877 Ex 6; Doc. 1026-1 at 54-59.]  On Tuesday, September 6, 2016 (the next business day after September 2, as September 5 was Labor Day), Judge Ross signed an order sealing a disc containing recordings of intercepted communications from TT1.[7]  The sealing order was docketed on September 7, 2016.

### 2.    Renewal Application for Wiretap of TT1 and Wiretap Application for Target Telephone 2

On September 7, 2016, the government applied for an order authorizing continued interception of communications over TT1, as well as interception of communications over a cellular telephone with number 404-254-7533 ("TT2"), believed to be used by Defendant Mitchell.[8]  On that same day, United States District Judge Richard W. Story entered an order authorizing interceptions over

---

[6] The application for TT1 is docketed at Doc. 877 Ex. 2 and Doc. 1026 at 18-115, and Judge Ross's order granting the application is docketed at Doc. 877 Ex. 16 and Doc. 1026-3 at 33-49.

[7] The order sealing the intercepted communications, and the government's application in support, is docketed at Doc. 877 Ex. 6 and Doc. 1026-1 at 54-59.

[8] The application for the renewal of TT1 and for TT2 is docketed at Doc. 877 Ex. 7 and Doc. 1026-1 at 60-170.

11

TT1 and TT2.[9]  Interceptions of both TT1 and TT2 began on September 7, 2016, and interceptions over TT1 ended on October 6, 2016, and interceptions over TT2 ended on September 25, 2016.  [*See* Doc. 877 Ex 8; Doc. 1026-1 at 1-15.]  On October 7, 2016 and September 28, 2016, Judge Story signed orders sealing recordings of intercepted communications from TT1 and TT2.[10]

### 3.      Wiretap Application for Target Telephone 3

On October 31, 2016, the government applied for an order authorizing the interception of communications over cellular telephone number 404-587-3555 ("TT3"), believed to be used by codefendant Joseph Riley.[11]  On that same day, United States District Judge Mark H. Cohen entered an order authorizing interceptions over TT3.[12]  Interceptions began on November 1, 2016, and ceased on November 30, 2016.  [*See* Doc. 877 Ex 10; Doc. 1026-1 at 1-7.]  On December

---

[9] Judge Story's order granting the application for the renewal of TT1 and for TT2 is docketed at Doc. 877 Ex. 17 and Doc. 1026-3 at 50-68.

[10] The order sealing the intercepted communications, and the government's application in support, is docketed at Doc. 877 Ex. 8 and Doc. 1026-1 at 1-15.

[11] The application for TT3 is docketed at Doc. 877 Ex. 9 and Doc. 1026 at 16-136.

[12] Judge Cohen's order authorizing the TT3 wiretap is docketed at Doc. 877 Ex. 18 and Doc. 1026-3 at 69-88.

1, 2016, Judge Cohen signed an order sealing recordings of intercepted communications from TT3.[13]

## II.   PROCEDURAL POSTURE

On June 7, 2018, Defendant Sartor filed a "Preliminary Motion to Suppress Wiretap Evidence" [Doc. 526], and on August 9, 2018, he particularized his preliminary motion [Doc. 590].  On August 10, 2018, Defendants Michael Jackson, Clark, and Balcazar each filed a preliminary motion to suppress wiretap evidence. [Docs. 607 (Jackson), 614 (Clark) 617 (Balcazar).][14]

Following a pretrial conference, the Court issued an order on August 17, 2018, directing the defendants who had filed motions to suppress wiretap evidence to perfect their motions (1) to make an adequate showing of standing as to each wire intercept order being challenged and (2) to provide a particularized basis for suppressing each of the challenged wiretaps.  [Doc. 655 (Aug. 18, 2018 Order).][15]

---

[13] The order sealing the intercepted communications, and the government's application in support, is docketed at Doc. 877 Ex 10 and Doc. 1026-1 at 1-7.

[14] Defendant Balcazar "particularize[d]" his preliminary motion on September 13, 2018, with a single paragraph acknowledging that he was a party to intercepted communications and therefore an aggrieved person under Title III. [Doc. 702.]

[15] Anticipating that other defendants would file challenges to wiretap intercepts, the Court applied the requirements to all such motions going forward. [Doc. 655 at 2.]

13

Between mid-October and early November 2018, Defendants Clark, Mitchell, Balcazar, and Jackson, filed particularized motions.  [Docs. 747 (Clark), 779 (Mitchell), 797 (Balcazar), and 827 (Jackson).][16]

On January 17, 2019, the government filed an omnibus response to the particularized motions filed by Defendants Sartor, Mitchell, Balcazar, and Jackson. [Doc. 873.]  On May 29, 2019, the government filed a separate response to Defendant Clark's particularized motion to suppress, in which it largely repeats arguments it raised in its initial response brief.[17]  [Doc. 996.]

Defendants Jackson, Mitchell, and Balcazar have filed replies in support of their motions.  [Docs. 958 (Jackson), 966 (Mitchell), 980 (Balcazar).]

These motions are now ripe for consideration.

---

[16] In late October 2018, codefendant Cetera Bowles-Griffin also filed a motion and amended motion to suppress wiretap evidence from the intercepts of TT1, TT2, and TT3 [Docs. 805 and 815], but has since entered a guilty plea and withdrawn her challenges [Doc. 1015].

[17] In the government's initial response filed January 17, 2019, it noted its belief that Clark had not filed a perfected motion and, thus, deemed Clark's motion to be abandoned and did not respond to his preliminary motion to suppress.  [Doc. 873 at 8 n.3.]  On April 29, 2019, the Court, identified that Clark had, in fact, filed a perfected motion, and ordered the government to file its response by May 29, 2019.  [Doc. 977.]

## III.   STANDING

Before turning to Defendants' substantive challenges to the wiretaps in this case, the Court addresses the extent to which the Defendants have standing to challenge to suppress evidence gathered under the wiretap orders.  As noted above, under Title III, only an "aggrieved person" may move to suppress wiretap evidence.  18 U.S.C. § 2518(10)(a).  Title III defines an "aggrieved person" as a "person who was a party to any intercepted . . . communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  In order to show that he is an "aggrieved person," a defendant must show that "(1) he was a party to the communication, (2) the wiretap efforts were directed at him; or (3) the interception took place on his premises."  *See United States v. Benitez-Tornes*, No. 1:07-CR-279-CAP-GGB, 2008 WL 11348307, at *1 (N.D. Ga. Oct. 1, 2008) (quoting *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006)).  The defendant bears the burden to show that he is an "aggrieved person."  *Id.*; *United States v. Ortega-Estrada*, No. 1:07-CR-356-TWT-CCH, 2008 WL 4716949, at *2 (N.D. Ga. Oct. 22, 2008) (quoting 18 U.S.C. § 2518(10)(a)), *adopted*, *id.* at *1.

15

The government concedes for present purposes—and the Court agrees—that Mitchell has standing with respect to intercepts of GTT1 through GTT5,[18] and TT1; that Clark has standing as to GTT1 through GTT7, and TT1 and TT2; and that Balcazar has standing with respect to intercepts from the renewal of TT1 only. [*See* Doc. 873 at 12-14; Doc. 996 at 10-11.]  A chart showing the defendant and the corresponding wiretap to which the Government concedes standing follows:

---

[18] In his motion, Mitchell concedes that his communications were intercepted (and he therefore an "aggrieved person") in relation to wiretaps of the following numbers:  404-205-3134, 404-623-5727, 678-887-2540, and 678-832-3114. [Doc. 779 at 3.]  These are the numbers for GTT1, GTT2, GTT4, and GTT5, respectively. [*See* TT1 Aff at ¶¶ 19-20.]  However, Mitchell mistakenly identifies 678-887-2540 as GTT3 instead of GTT4. [Doc. 779 at 3.]  It is therefore unclear whether Mitchell conceded his communications were intercepted over GTT3 or GTT4.

Possibly relying on Mitchell's confused concession, the government grants Mitchell standing as to GTT3 (rather than GTT4). [Doc. 873 at 14.]  Mitchell, on reply, then mistaken concludes that the government has conceded standing on GTT1 through GTT5 (inclusive).  [Doc. 966 at 1.]   Because any errors in identifying the numbers on which Mitchell's communications were intercepted—at least as between GTT3 and GTT4—do not impact the substantive analysis undertaken below, the Court will assume for the purposes at hand that Mitchell has standing as to intercepts from GTT1 through GTT5.

16

|          | GTT1 | GTT2 | GTT3 | GTT4 | GTT5 | GTT6 | GTT7 | TT1 | TT2/TT1 | TT3 |
|----------|------|------|------|------|------|------|------|-----|---------|-----|
| Mitchell | •    | •    | •    | •    | •    |      |      | •   |         |     |
| Clark    | •    | •    | •    | •    | •    | •    | •    | •   | •       |     |
| Balcazar |      |      |      |      |      |      |      |     | •       |     |

The government contends, however, that Defendants Gary Sartor and Michael Jackson lack standing to challenge any of the wiretaps in this case because they were in custody while the wiretaps were active, and therefore had no reasonable expectation of privacy with regard to any intercepted communications, all of which occurred over contraband cell phones. [Doc. 873 at 9-12.] Similarly, the government argues that with respect to interceptions over TT3, Mitchell was in law enforcement custody at the time of those intercepts, and therefore he too could not have had a reasonable expectation of privacy regarding any of those interceptions. [*Id.*]

Only Jackson responds in opposition to the government's argument on standing.[19] Jackson contends that he meets the statutory definition of an aggrieved

_____

[19] Although Sartor's preliminary motion included a footnote contending that he can challenge the wiretaps without having standing under the Fourth Amendment [*see* Doc. 526 at 3 n.2], he did not file a reply in response to the government's argument, and Mitchell does not address this issue in his reply [*see* Doc. 966]. Likewise, Balcazar's reply appears simply to affirm the government's

person because he was intercepted over GTT5 and GTT7 and he was specifically named as a target of the wiretap orders for TT1, TT2, and TT3; and, as a result, he has standing to challenge the wiretaps irrespective of whether he had a reasonable expectation of privacy in the communications.  [Doc. 958 at 1-2.]  He contends that the expectation-of-privacy inquiry is relevant only in a Fourth Amendment challenge and that here, he moves to suppress the information only under Title III.  [*Id.* at 2-5.]  He argues that standing for purposes of Title III is broader than standing in the context of a Fourth Amendment challenge because the statutory definition of "aggrieved person" is not limited to persons who have a reasonable expectation of privacy under the Fourth Amendment.  [*Id.*]  Jackson asserts that the government's authority—that prisoners lack recourse to Title III to challenge wiretap intercepts—amounts to mere *dicta* or is otherwise distinguishable or inapplicable; however, he fails to identify any authority affirmatively supporting his position.  [*Id.*]

The Eleventh Circuit has not addressed the argument that Jackson makes here; however, other courts in this Circuit (and elsewhere) considering it have held

---

acknowledgement of standing only as to intercepts from the renewal of TT1.  [*See* Doc. 980.]

that the interception of an inmate's telephone calls over a contraband cell phone fall outside the purview of Title III protection. *See, e.g., United States v. Allen*, No. CR417-208, 2018 WL 6242868, at *1-3 (S.D. Ga. Nov. 29, 2018), *report and recommendation vacated in part sub nom. United States v. Jenkins*, 2019 WL 112785 (S.D. Ga. Jan. 4, 2019) and *adopted in relevant part*, 2019 WL 254661 (S.D. Ga. Jan. 17, 2019); *United States v. Nava*, No. 1:17-CR-347-TCB-CMS, 2018 WL 5624731, at *4 (N.D. Ga. Aug. 9, 2018), *report and recommendation adopted*, 2018 WL 4350183 (N.D. Ga. Sept. 12, 2018); *United States v. Morris*, No. 1:15-cr-351-WSD, 2016 WL 4267990, at *4-5 (N.D. Ga. Aug. 15, 2016); *accord United States v. York*, No. 116CR00069LJOSKO11, 2017 WL 5068143, at *4 (E.D. Cal. Sept. 29, 2017), *reconsideration denied*, 2017 WL 4959244 (E.D. Cal. Nov. 1, 2017).  Those cases reason that (1) despite the seemingly broad definition of "aggrieved person" under the statute, the weight of authority nevertheless dictates that term must be interpreted in accordance with Fourth Amendment standing rules; (2) an inmate does not have a reasonable expectation of privacy in communications over a contraband phone, as prisoners have no expectation of privacy in their prison cells; (3) therefore, a prisoner does not have standing to challenge the interception of communications over a contraband device.

19

*See, e.g., Morris*, 2016 WL 4267990, at *4-5.  Further, those opinions found the reasoning to square with federal and state laws prohibiting possession of cell phones by prison inmates.[20]  *Id.*; *see also Allen*, 2018 WL 6242868, at *2-3.  This logic is sound, and Court applies it in this case.

Thus, while the Court accepts that Jackson meets the literal definition of an "aggrieved person" under Title III,[21] the weight of authority dictates that the protections afforded an "aggrieved person" under Title III must be interpreted "in accordance with standing requirements usually applied to suppression claims under the Fourth Amendment."  *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991).  This weight comes both from earlier Supreme Court and Fifth Circuit decisions addressing the relationship between Title III's protections and Fourth Amendment standing, *see Alderman v. United States*, 394 U.S. 165, 175 (1969) ("[Title III's] legislative history indicates that 'aggrieved person,' the limiting

---

[20] Both federal and state statutes criminalize the possession of cell phones by inmates.  *See* 18 U.S.C. § 1791 (establishing criminal penalties for possession of a prohibited objected," including mobile phones); O.C.G.A. § 42-5-18(c)-(d) (making possession of an unauthorized mobile phone a felony punishable by up to five years of imprisonment).

[21] Jackson was named as a target subject on TT1, TT2, TT3, and he admits that he was intercepted on GTT5 and GTT7.  [Doc. 827 at 2-3.]  The government also does not contest that Jackson meets the literal definition of an "aggrieved person" under Title III.  [*See* Doc. 873 at 12.]

phrase currently found in Fed. Rule Crim. Proc. 41(e), should be construed in accordance with existent standing rules.") (citing S. Rep. No. 1097, 90th Cong., 2d Sess., at 91, 106))[22]; *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975) (construing definition of aggrieved person in light of "prestatutory fourth amendment law"); as well as more recent opinions from this District on the specific

---

[22] The Court understands *Alderman*'s recognition that only persons who have a reasonable expectation of privacy have standing to move to suppress the contents of communications intercepted in violation of Title III to be *dicta*. As Magistrate Judge Justin S. Anand explained:

> *Alderman*'s comment on the meaning of "aggrieved person" in Title III appears to be *dicta*, because the surveillance at issue in *Alderman* was undertaken prior to the enactment of Title III. The Supreme Court generally analyzed the propriety of the telephonic surveillance in that case under pre-Title III authority, including the Fourth Amendment itself and the then-current version of Fed[eral Rule] 41(e). The Court simply offered as *dicta* a comment that Congress did not intend to expand the standing rules "[i]n its recent wiretapping and eavesdropping legislation," i.e., Title III, which had been enacted during the pendency of the *Alderman* case.

*United States v. Morris*, No. 1:15-cr-351-WSD-JSA, 2016 WL 8669407, at *3 n.3 (N.D. Ga. July 15, 2016) (citing *Alderman*, 394 U.S. 174-75, n.9). Jackson goes a step further though, characterizing the Court's language as mere "musings," [*see* Doc. 958 at 2], and encourages this Court to entirely disregard what the Supreme Court said. The Court declines to do so. Though not the holding in *Alderman*, the Supreme Court's statement (and reasoning) is still highly persuasive, especially in the absence of any binding authority taking the opposite approach. Accordingly, this Court will not ignore *Alderman*. *See Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997) (recognizing that "dicta from the Supreme Court is not something to be lightly cast aside").

question at hand, *see United States v. Montemayor*, No. 1:09-CR-551-LMM-JFK, 2018 WL 4517634, at *2 (N.D. Ga. Aug. 27, 2018), *report and recommendation adopted*, 2018 WL 4517459 (N.D. Ga. Sept. 20, 2018) (same); *United States v. Aguirre-Benitez*, No. 3:16-CR-009-TCB-RGV, 2017 WL 9477737, at *12 (N.D. Ga. Apr. 24, 2017), *report and recommendation adopted*, 2017 WL 2274621 (N.D. Ga. May 25, 2017) ("The standard used to determine whether a defendant is an aggrieved person is coextensive with the standing requirements applied to Fourth Amendment suppression claim.") (citations omitted); *Morris*, 2016 WL 4267990, at *4 (collecting cases); *United States v. Chaidez-Ontiveros*, No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, at *5 (N.D. Ga. Oct. 25, 2011), *report and recommendation adopted*, 2012 WL 984269 (N.D. Ga. Mar. 21, 2012) ("An 'aggrieved person,' as defined both by [Title III], and in accordance with the Supreme Court's decision in *Alderman* . . . indicates that the Act's standing requirement implements existing Fourth Amendment standing rules."). *Accord United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1116 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006) (citations omitted) ("The Supreme Court has interpreted the[ "aggrieved person"] provisions as limiting standing to challenge wiretaps to persons whose Fourth Amendment rights were violated by

22

the interception.); *United States v. Williams*, No. CR418-147, 2019 WL 1612833, at *7 (S.D. Ga. Feb. 27, 2019)*, report and recommendation adopted*, No. CR418-147, 2019 WL 1601375 (S.D. Ga. Apr. 15, 2019) (recognizing that even though Title III facially provides a "broad suppression right," "[c]ourts have consistently recognized that the statutory provision incorporates existing Fourth Amendment 'standing' limitations").  As a result, the defendants challenging carceral wiretap interception of contraband devices must establish not merely that they are "aggrieved persons" under Title III, but also that they have standing under the Fourth Amendment.

Along these lines, then, a defendant challenging a search under the Fourth Amendment "bears the burden of establishing 'both a subjective and an objective expectation of privacy' in the area or object searched."  *United States v. Daniels*, 554 F. App'x 885, 886 (11th Cir. 2014) (quoting *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006)).  "'The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable.'"  *Id*. (quoting *Segura-Baltazar*, 448 F.3d at 1286).  "'[O]nly individuals who actually enjoy the reasonable expectation of privacy have standing

23

to challenge the validity of a government search.'" *Id.* (quoting *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (alteration supplied).

Jackson, Sartor, and Mitchell do not dispute that they were in custody for at least part of the relevant time period,[23] or that it is illegal to possess an unauthorized cell phone while in custody.  Nor do they maintain that they had a subjective expectation of privacy with respect to communications over contraband cell phones, much less point to any authority to suggest that society would recognize such an expectation.  And nor could they.  The Supreme Court has made clear that inmates generally have no expectation of privacy—and, thus, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984).  In the absence of a reasonable expectation of privacy, it follows that Defendants Sartor, Jackson, and Mitchell lack standing to challenge the interception of communications over contraband cell phones while they were in custody.

For these reasons, then, the Court rejects Jackson's argument that he has a right under Title III to suppress communications made over contraband cell phones,

---

[23] As mentioned earlier, Jackson and Sartor do not contest they were incarcerated for all of the relevant time period.

24

and finds that Jackson and Sartor lack standing to challenge any of the wiretaps in this case, and that Mitchell lacks standing to challenge TT3.

But even if Jackson, Sartor, and Mitchell had standing to challenge all of the wiretaps in this case, their arguments fail on their substantive merits for the reasons discussed in the next section.

## IV.   SUBSTANTIVE CHALLENGES TO THE STATE AND FEDERAL WIRETAPS

Turning to the substantive arguments, the Court will address the challenges to the state wiretaps first, and thereafter address the challenges to the federal wiretaps.

### A.   State Wiretaps

As noted above, the government concedes that Mitchell has standing to challenge the interception of communications over GTT1 through GTT5, as Mitchell admits that he was intercepted over each.[24]  [Doc. 873 at 14; *see also* Doc.

---

[24] Or rather, given the confusion noted earlier, the Court will treat the issue as though the government and Mitchell have conceded the issue of standing as to GTT1 through GTT5.

779 at 2-3; Doc. 966 at 1.[25]]  The government also concedes that Clark has standing as to GTT1 through GTT7.  [Doc. 996 at 11.]

Mitchell and Clark first argue by assertion that the state wiretaps are invalid because the Gwinnett County Superior Court lacked jurisdiction to issue the warrants outside the boundaries of its judicial circuit.  [Doc. 747 at 23; Doc. 779 at 24-25.]  This contention—which consists of a single sentence and a citation to *Luangkhot v. State*, 292 Ga. 423 (2013)—is completely undeveloped.  The two Defendants do not cite to any facts to support their argument, leaving the Court to speculate as to precisely how the wiretaps are flawed based upon the "jurisdictional" issue.[26]  More significantly, though, a review of *Luangkhot* and subsequent statutory enactment demonstrates that Mitchell and Clark's conclusory argument is without support.  In *Luangkhot*, the Georgia Supreme Court held that "in the absence of any state statute expressly granting superior courts the authority to issue wiretap warrants that apply outside their own judicial circuits, . . . current state law vests the authority to issue wiretap warrants only in those superior courts

---

[25] Neither Mitchell's perfected motion [Doc. 779] nor his reply [Doc. 966] is paginated; thus, the Court refers to specific page numbers using the page numbering automatically generated by CM/ECF.

[26] Moreover, Clark has filed no reply, and Mitchell in his reply appears to abandon all challenges wiretaps of GTT1 through GTT5.  [See Doc. 966 at 1-2.]

of the judicial circuits in which the tapped phones or listening post are located." *Luangkhot*, 292 Ga. at 427.  Following the decision in *Luangkhot*, however, the Georgia General Assembly amended the state wiretap statute to give superior court judges authority to issue warrants that have state-wide application and permit the interception of phone calls from any location in the state.  *See* O.C.G.A. § 16-11-64(c); *see also United States v. Lara,* 588 F. App'x 935, 938 n.2 (11th Cir. 2014) (noting that after *Luangkhot*, the Georgia wiretap statute was "amended . . . to permit superior court judges to issue warrants throughout the state, thereby removing the jurisdictional issue").  The effective date of the amended statute was February 13, 2013, *see* O.C.G.A. § 16-11-64, nearly three years before the state wiretaps at issue in this case were issued.  Accordingly, the Court fails to see what application, if any, *Luangkhot*, has to the state wiretaps.  For these reasons, then, the Court rejects the argument that the state court wiretap orders were jurisdictionally defective.

Clark and Mitchell next argue—in what appears to be their primary challenge to the state wiretaps—that the wiretaps are invalid because they were not properly sealed.  [Doc. 747 at 23-24; Doc 779 at 25-26; *see also* Doc. 966 at 1-2 ("The only challenge as to these [state] wire interceptions was that the sealing order

27

was not issued in a timely manner.").]  In particular, they contend that Judge

Hutchinson ordered the recordings sealed at the time he authorized the state

wiretaps, rather than after the interceptions ended.  [*Id.*]  This argument is factually

incorrect.[27]  Judge Hutchinson actually signed an order sealing the intercepted calls

from GTT1 through GTT7 on February 17, 2016, complying with the requirements

of Section 2518(8)(a) of Title III.  [*See* Doc. 877 Ex. 15; Doc. 1026-3 at 32.]

Indeed, having reviewed Judge Hutchinson's sealing order, Mitchell acknowledges

on reply that the sealing order appears "to be in compliance with state and federal

procedures" and has withdrawn this challenge.  [Doc. 966 at 1.]

Last, Clark and Mitchell argue that "[t]he language in the Gwinnett County

wiretaps is also overly broad" and that "the affidavit in support of these wire taps

---

[27] Both Mitchell and Clark appear to have largely adopted this argument, with both citing to arguments "outlined by counsel for defendant Sartor at doc. 526 at 7." [*See* Doc. 747 at 23 n.7; Doc 779 at 25 n.4.]  Sartor's motion, in turn, correctly acknowledges the fact that the sealing orders issued by Judge Hutchinson on the same dates as the wiretap authorization orders were orders to seal the wiretap *application* materials, but simply ignores the later orders sealing the wiretap *interception* materials. [*See* Doc. 526 at 7-8.]  Mitchell and Clark's factual misconception appears to be based upon a conflation between Judge Hutchinson's orders sealing *application* materials [*see* Doc. 877 Ex. 14; Doc. 1026-3 at 29-31] and the sealing orders relevant to the Title III sealing inquiry [*see* Doc. 877 Ex. 15; Doc. 1026-3 at 32].  In any event, the Defendants' confusion does not impact the fact that Judge Hutchinson signed the appropriate order sealing immediately after the wiretaps ended.

makes no showing of necessity for the issues of such wire taps." [Doc. 747 at 25; Doc. 779 at 26.] This argument is again far too general and undeveloped. This Court previously directed the parties to make particularized arguments in support of their theories [*see* Doc. 655], and this argument falls far short. Clark and Mitchell do not identify any particular deficiencies in the state wiretap orders, applications, or affidavits. This Court will not endeavor to develop Defendants' arguments for them. Accordingly, those conclusory arguments provide no basis for suppression of the communications intercepted on the state wiretaps. *United States v. Richardson*, 764 F.2d 1514, 1526-27 (11th Cir. 1985) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented," and thus, a "trial court may refuse a defendant's . . . motion to suppress if the defendant fails to allege facts that, if proved, would require the grant of relief."); *see also United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000).[28]

---

[28] *Accord United States v. Craig*, No. 1:16-CR-145-TWT-JKL, 2017 WL 10410307, at *4 (N.D. Ga. Oct. 26, 2017), *report and recommendation adopted*, 2018 WL 5016501 (N.D. Ga. Oct. 16, 2018) (denying motion to suppress based upon "conclusory allegations and general assertions") (citing *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *8 (N.D. Ga. June 12, 2007)); *United States v. Chavez-Maciel*, No. 1:10-CR-00490-TCB, 2012 WL 6742323, at *20 (N.D. Ga. Dec. 7, 2012), *report and recommendation adopted*, No.

For the foregoing reasons, it is recommended that Defendants' motions to suppress as they relate to the state wiretaps be **DENIED**.[29]

## B.    Federal Wiretaps

The Court next addresses Defendants' challenges to the wiretap authorizations that the government obtained from federal judges:  (1) the initial wiretap application for TT1; (2) the application for a renewed wiretap of TT1 and a wiretap of TT2; and the application for a wiretap of TT3.[30]

---

1:10-CR-490-1-TCB, 2012 WL 6738771 (N.D. Ga. Dec. 31, 2012) (denying as abandoned preliminary motion after arguments were not perfected upon court order); *United States v. Shorr*, No. CR. 1:07CR182-1-TWT, 2008 WL 655994, at *1 (N.D. Ga. Mar. 10, 2008) (same).

[29] Defendants Jackson and Sartor also substantively challenge the state wiretaps.  [*See* Docs. 526, 590, 827.]  Jackson's challenge to GTT5 and GTT7 is identical to Clark's and Mitchell's.  [Doc. 827 at 26-28.]  Thus, even if Jackson had standing to seek suppression of evidence from those wiretaps, his challenge also fails.  Similarly, Sartor challenges the state wiretaps on the grounds that they were not properly sealed [Doc. 526 at 7-8]; however, that argument fails for the same reasons as just discussed.  Sartor also challenges that state wiretap applications as overbroad and fail to show necessity.  [*Id.* at 6-7.]  Those arguments also fail for the same reasons as Clark's and Mitchell's, since Sartor does not provide a particularized basis for suppression, in contravention of this Court's August 18, 2018 Order.  [*See* Doc. 655.]  Accordingly, even if Sartor had standing to challenge the state wiretaps, his arguments fail.

[30] To recap, Mitchell and Clark have standing to challenge the initial wiretap application for TT1; Mitchell, Clark, and Balcazar have standing to challenge the

### 1.   TT1

### a.   Summary of SA Szabo's Affidavit Supporting the TT1 Wiretap Application

In support of the application for the wiretap of TT1, SA Szabo provided a 71-page, 118-paragraph affidavit in which he summarized his training and experience; explained the purpose of his affidavit; identified the twenty-two known "target subjects" (which included, among others, Clark, Jackson, Mitchell, and Sartor); and provided the objectives of the investigation.  (TT1 Aff. ¶¶ 1-13.)  He additionally identified the bases for the facts set forth in his affidavit and summarized prior applications for interception.  (*Id.* ¶¶ 14-22.)

In a 32-page section of the affidavit titled "Statement of Probable Cause," SA Szabo relayed information to support probable cause for authorization of the wiretap on TT1.  (TT1 Aff. ¶¶ 23-76.)  He provided background information regarding the investigation of the Nine Trey Gangster Bloods (as well as the United Blood Nation), including the history and organization of the gang both nationally and within Georgia.  (*Id.* ¶¶ 23-46.)  Among other things, he explained that during the course of the investigation, agents learned that codefendant Evans was a leader

_____

application for the renewed wiretap of TT1 and the wiretap of TT2, but none of the above Defendants has standing to challenge TT3 wiretap.

of a division or "line" of the Nine Trey Gangsters known as the "Firaq" or "Fire" Line.  (*Id.* ¶ 42.)  He additionally relayed that within the Georgia Department of Corrections, the leadership of the Firaq Line under Evans included Defendant Michael Jackson, who held the rank of "Third Floor."  (*Id.* ¶ 44; *see also id.* ¶ 29 (identifying Third Floor as a mid-tier leadership rank within the Nine Trey).)

SA Szabo indicated that investigation had shown Evans also controlled non-incarcerated gang members.  (TT1 Aff. ¶ 45.)  SA Szabo explained that based on information obtained from a confidential human source ("CHS-1"), agents believed that Defendant Clark, the holder/user of TT1, held the rank of "Fifth Floor," a position of leadership under Evans.  (*Id.*; *see also id.* ¶ 29 (identifying Fifth Floor as a high-tier state leadshiper rank.)  Agents further believed from recorded jail calls that Clark might "have recently received additional status," meaning that he had moved up within the ranks of the gang.  (*Id.* ¶ 45.)  Although agents had not identified all the gang members holding ranking positions "on the street" subordinate to Clark, they had been able to identify other alleged leaders, including Defendants Mitchell, though intercepted calls, recorded jail calls, a seized ledger, and social media posts.  (*Id.*)

SA Szabo explained that on February 16, 2016, Evans was arrested for the murder of Jeffery Anderson.  (TT1 Aff. ¶ 47.)  At the time of his arrest, Evans was in the custody of the Georgia Department of Corrections at Hancock State Prison. (*Id*. ¶ 44.)  When prison officials executed a production order to transfer Evans to the custody of Gwinnett County to answer the murder charges, a legal pad reportedly containing a roster of Nine Trey gang members in the Georgia Department of Corrections, as well as those "on the street," was recovered from the locker box in Evans's cell.  The roster reportedly listed 158 inmate gang members of the Firaq Line, listed according to their corresponding Georgia Department of Corrections institution (29 separate institutions being listed), as well as 11 inmate gang members in prison in South Carolina.  It also contained the name of "Original Gangsters" or "OGs" as well as gang oaths, goals, rules, codes of conduct, laws, principles, and colors.  Further, the phrases "codes of conduct" and "colors" were spelled "bodes of xonduct" and "Xolors," consistent with the practice of Blood gang members to cross out or replace the letter c in their writing or typing with the letter "b" or other letters such as "x".  According to SA Szabo, "[t]he use of gang lingo scattered throughout the document and list of oaths identifies the seized legal pad as [a Nine Trey Gangster] ledger, as does the fact that many of the listed 'OGs'

33

corroborates law enforcement's prior identification of several top [Nine Trey Gangster] members." (*Id.*)

SA Szabo then relayed the substance of certain calls intercepted from the Gwinnett County jail,[31] which indicated Clark's position in the gang, his alleged distribution of firearms and narcotics, the gang's alleged involvement in financial fraud activities and importation of contraband cell phones into prison, and information about an alleged shooting on February 13, 2016. (TT1 Aff. ¶¶ 47-67.) More specifically, SA Szabo stated that on June 3, 2016, Clark briefed Evans over the Gwinnett County Jail inmate telephone system on gang-related news, including that another gang leader, Defendant Sartor, was working to raise money from gang members to pay for Evans's legal defense and that Clark was seeking to invoke his status in the gang to collect funds. (*Id.* ¶ 47.) SA Szabo also explained that during that same call, Clark and Evans expressed their disagreement with how Messiah May, an alleged gang leader, was running the gang in Evans's absence. (*Id.* ¶ 48.) Clark also reported to Evans during the call that a fellow gang member, Demacion

---

[31] SA Szabo explained that all inmate calls at the Gwinnett County jail were recorded and subjected to monitoring, and that "a recorded audio warning [was] played before all inmate calls," to advise them of that fact. (TT1 Aff. ¶ 47.)

Moore, had been arrested and that Clark believed Moore might cooperate with law enforcement.  (*Id.* ¶ 49.)

SA Szabo also relayed the substance of intercepted calls and text messages over GTT5 between February 5 and 12, 2016.  (TT1 Aff. ¶¶ 50-55.)  On February 5 and 6, Clark and an unknown male were intercepted discussing a potential drug transaction involving marijuana, cocaine, and opioids among other drugs.  (*Id*. ¶¶ 50-51.)  SA Szabo stated that in an intercepted call on February 6, 2016, Clark referred Jordan Bird (an alleged fellow gang member) to Mitchell so Bird could acquire a new gun.  (*Id.* ¶ 52.)  Later in that same February 6 call, Clark and Bird allegedly discussed another potential drug transaction.  (*Id.* ¶ 53.)  On February 7, 2016, Clark was intercepted on a call in which he allegedly requested cocaine from an alleged supplier.  (*Id.* ¶ 54.)  And on February 12, 2016, a call was intercepted between Clark and an unknown male in which they discussed distribution of firearms, including a plan to illegally traffic firearms from Georgia to New York. (*Id*. ¶ 55.)

SA Szabo also relayed that Clark was intercepted over GTT5 and GTT7 on February 4, 5, and 10, 2016, communicating with Kevin Eason, an inmate at Ware State Prison in Waycross, Georgia, who was using contraband telephone, about a

credit card fraud scheme that Eason was allegedly running from prison.  (TT1 Aff. ¶ 56-57.[32])  In an intercepted call on February 11, 2016, Eason allegedly attempted to get Clark's help purchasing and smuggling contraband cell phones into prison, which Eason would then resell for a profit.  (*Id.* ¶ 58.)  During that same call, Clark and Eason allegedly discussed the Eason's recent promotion within the gang and new rankings for other incarcerated gang members.  (*Id.* ¶ 59.)

SA Szabo also relayed that on February 13, 2016, a Nine Trey Gangster member shot a fellow gang member, V.P., in retaliation for maligning one of the gang's leaders.  (TT1 Aff. ¶ 60.)  SA Szabo provided detailed information about the substance of intercepted telephone calls and text messages, including over GTT5 and GTT7, involving Clark, Evans, and Mitchell (among others) allegedly planning the shooting and discussing the shooting after it occurred.  (*Id.* ¶¶ 61-67.)

SA Szabo then explained the identification of 404-360-4248 (that is, TT1) as a target telephone, stating that TT1 was activated on February 13, 2016, and that the following day, Clark allegedly sent a text message using TT1 to Evans (who was using GTT7) identifying himself to Evans on a new device.  (TT1 Aff. ¶ 68.)

---

[32] According to SA Szabo's Affidavit, Eason held high-ranking position of leadership within the gang within the Georgia Department of Corrections.  (TT1 Aff. ¶¶ 29, 44.)

The day after that, another text message exchange, this time setting up a conference call, was intercepted over GTT7 between TT1 and GTT7.  (*Id.* ¶ 69.)  Then, on February 20, 2016, Evans was intercepted on the Gwinnett County Jail inmate telephone system speaking with codefendant Joseph Riley and asking Riley for Clark's telephone number.  (*Id.* ¶ 70.)  In response, Riley told Evans that Clark's new telephone number was TT1.  (*Id.*)  Clark ceased using GTT5 on February 25, 2016.  (*Id.* ¶ 71.)  SA Szabo explained that he believed that Clark began transitioning from GTT5 to TT1 after activating the latter, and that based on Evans and Riley seeking out Clark's new number, he believed that Clark would be using TT1 to continue to engage in criminal activity.  (*Id.*)

SA Szabo additionally stated that he confirmed that TT1 remained active as of the date of the application.  (TT1 Aff. ¶ 72.)  He also relayed findings based on toll records, which showed numerous calls and text messages with phone numbers used by Sartor, Riley, Mitchell, and Ronald Brantley, each of whom allegedly held a position of leadership within the gang.  (*Id.* ¶¶ 73-76.)

Based on these facts, SA Szabo explained that the interception of TT1 was necessary to accomplish the goals of the investigation, which included, (1) the nature, extent, methods, and identities of gang members and associates of the target

subjects; (2) the identifies, locations, and roles of the target subjects and their accomplices; (3) the distribution and transfer of funds and contraband in connection with illegal activities; (4) the existence and location of records related to the target subjects' illegal activities; (5) the location and source of resources used to finance the target subjects' illegal activities; (6) the location and disposition of proceeds from illegal activities; and (7) the locations and items used to further criminal activities. (TT1 Aff. ¶ 77.) The ultimate goal of the investigation, SA Szabo explained, was to disrupt and dismantle the gang. (*Id.* ¶ 78.) SA Szabo also stated that TT1 would be used to achieve the following objectives:

> identify CLARK's involvement in the distribution of drugs, the distribution of firearms, acts of violence and other crimes. Agents plan to disrupt and/ or prevent potential acts of violence, if sufficient information to do so is available. Furthermore, agents plan to identify: 1) additional members of the criminal enterprise; 2) the suppliers of drugs being sold; 3) the sources of the firearms being used by the [Nine Trey Gangster] members; 4) additional locations where gang meetings and gatherings are held; 5) the method used to collect and distribute drug and other illicit proceeds; and 6) specifics regarding the fraud scheme engaged in by [Nine Trey Gangster] members and others, including the identity of individuals who helped [Nine Trey Gangster] members obtain stolen identity information.

(*Id.*)

SA Szabo then described investigative techniques that law enforcement had used, were then presently using, or had decided not to use, and explained the

38

limitations associate with those techniques and why certain techniques were not viable options to pursue.  (TT1 Aff. ¶¶ 79-108.)  The Court addresses the various techniques identified by SA Szabo below.

### i. Wiretap Interceptions – Related Investigations

SA Szabo stated that there had been one other law enforcement investigation with a connection to the instant investigation, but that the other investigation had closed and the information from the other case, without more, would not permit the FBI to fulfil its investigative goals.  (TT1 Aff. ¶ 79.)  SA Szabo related that during the previous investigation, Clark and other suspected Nine Trey Gangster members were intercepted on GTT5 and that those communications provided valuable evidence regarding the structure of the organization and the types of crimes allegedly committed by its members.  (*Id.* ¶ 80.)  But, SA Szabo explained, those communications did not meet the current investigatory goals because the prior investigation focused on crimes occurring in Gwinnett County, and not the wider criminal enterprise that was the subject of the FBI investigation.  (*Id.*)

### ii. Pen Registers and Telephone Records

SA Szabo also stated that agents were using toll record analysis in connection with the investigation, and that they would continue doing so.  (TT1 Aff. ¶ 81.)  He explained that toll records "only provide agents with the facts

regarding the time, frequency, and duration of the calls placed or received," but not the contents of the conversations.  (*Id.*)  He further explained that he knew that gang members often subscribe to telephones using fictious names or the names of others in an attempt to thwart investigators, and, as an example, pointed out that TT1 had a subscriber name of "NO NAME Info" and an address of a default commercial address for Verizon Wireless in California, the service provider of TT1. (*Id.* ¶ 82.)  In addition, the government obtained orders authorizing the installation and use of a pen register, trap and trace, and enhanced caller ID device on eight telephones associated with four of the target subjects, including on TT1, but that without interception of communications over TT1, the agents would not know the content of the calls.  (*Id.* ¶ 83.)

### iii.    Confidential Informants, Cooperating Sources, and Undercover Agents

SA Szabo stated that law enforcement had developed a confidential source, identified as CHS-1, a Nine Trey Gangsters member; however, the CHS-1's ability to aid in the investigation was limited.  (TT1 Aff. ¶ 84.)  While CHS-1 provided "critical intelligence regarding the gang, CHS-1 [did] not have frequent contact with members of the specific Firaq Line of the [Nine Trey Gangsters] in Georgia." CHS-1 was reportedly viewed as an outsider by Nine Trey gang members in

Atlanta because he/she did not have well-established relationship with many of the gang members, and the target subjects were hesitant to associate with unknown persons. "Often individuals must be known through family ties, long-time friendships, or trusted persons who have been established with the organization in the past." (*Id.*)

SA Szabo explained that for many of the same reasons, using undercover agents was not a viable option. (TT1 Aff. ¶ 85.) He stated that gang members were "unlikely to discuss the full extent of their organization's activities or membership with someone who is not a trusted, known, or vouched for associate or gang member." As an example, SA Szabo pointed to an intercepted call on February 11, 2016, between Clark and Eason in which the two debated whether an individual claiming to be a gang member was actually a member. They ultimately decided that before he could be accepted, he would need to provide the name of a known gang member who could vouch for him. (*Id.*)

### iv.    Consensual Monitoring

SA Szabo then described another investigative technique, consensual recordings, which are recorded conversations of an undercover agent or cooperating source, and that such recordings were subject to many of the same limitations as he described with using confidential and undercover sources. (TT1

Aff. ¶ 87.)  He stated that the FBI had conducted consensual recording between CHS-1 and a limited number of Nine Trey Gangster members in the Atlanta area, but that CHS-1's contact with gang leadership was limited.  Without the requested wiretap, SA Szabo explained, "agents may only be able to identify a small number of persons engaged in this criminal enterprise and a limited number of criminal schemes." (*Id.*)

> ### v.     Interviews,     Arrests,     and     Grand     Jury Subpoenas

SA Szabo next addressed investigative methods involving interviews, arrests, and subpoenas.  (TT1 Aff. ¶¶ 88-94.)  He explained that target subjects and/or other witnesses would not provide a viable alternative to wire interceptions, as it was unlikely that the target subjects would speak to law enforcement for fear of incriminating themselves or retaliation.  (*Id.* ¶ 88.)  He also explained that his belief that attempts to conduct interviews would prejudice the investigation because "many co-conspirators would likely flee and/or fundamentally alter their activities if approached." (*Id.*)  He further stated that interviews of record custodians were of limited value because such individuals only have knowledge of the information contained in the records they maintain (such as billing records). (*Id.* ¶ 89.)  Similarly, some individuals might have a personal or business

42

relationship with the target subjects (such as a leasing agent or telephone subscriber), and those individuals could alert the target subject of law enforcement inquiry, thus compromising the investigation.  (*Id.*)

Beyond interviews, SA Szabo pointed out that arresting the target subjects would end the investigation prematurely, as law enforcement had only identified a small number of gang members, and arresting a limited number of individuals would not serve to dismantle the organization.   (TT1 Aff. ¶ 90.)   Instead, prematurely arresting suspected gang members would likely give the remaining members an opportunity to reorganize and elude law enforcement.  (*Id.*)  Likewise, grand jury subpoenas were not likely to be productive, since most witnesses were co-conspirators, and would likely invoke their privilege against self-incrimination, and even if they did testify, they might not be truthful.  (*Id.* ¶ 91.)

Next, SA Szabo stated that to the extent that law enforcement later identified potential cooperators, historical interviews would likely be of limited use because among other things, cooperating witnesses would fear likely retaliation from gang members; cooperating witnesses' knowledge is typically limited in scope and utility due to the complex structure of the gang; and there is a risk that any

cooperator would report the contact to the gang, compromising the investigation. (TT1 Aff. ¶¶ 92-93.)

Finally, SA Szabo stated that while a financial investigation was ongoing in an attempt to identify and locate bank accounts for target subjects, the financial records alone would not reveal all the identities of the targets, their sources of income, and the methods and/or activity of gang members. (TT1 Aff. ¶ 94.) SA Szabo explained that in his experience, it is common for gang members and money launderers to use nominees and proxies to purchase assets and launder criminal proceeds. Thus, even though agents continued to identify and locate financial records, those records had limited utility. (*Id.*)

### vi.    Physical and Electronic Surveillance

SA Szabo expressed his belief that physical surveillance, in conjunction with geo-location data, would not be sufficient "(a) because of the general limitations of simple physical surveillance, and (b) because the gang is cognizant of law enforcement." (TT1 Aff. ¶ 95.) SA Szabo provided detail concerning numerous instances where law enforcement surveilled Defendants Clark, Riley, and Mitchell, as well as another gang member, Ronald Brantley, between February 13, 2016 and July 26, 2016, and explained why such surveillance was inadequate. (*Id.* ¶¶ 96-99.) For instance, he related that on February 13, 2016, agents established physical

surveillance of Clark at a city park where members of the Atlanta chapter of the Firaq Line was set to meet. (*Id.* ¶ 96.) Agents were able to observe gang members as they arrived, but during the meeting, Clark, Mitchell, and other suspected gang members walked to a secluded area of the park that was not easily visible. While agents were able to observe Clark and Mitchell meet, they had no way of knowing what they talked about before, during, or after the meeting. (*Id.*)[33]

SA Szabo next relayed that on March 23, 2016, agents established surveillance at Clark's residence and observed him engage in which appeared to be a drug transaction with another individual. (TT1 Aff. ¶ 97.) SA Szabo stated that it was likely that communications from before the purported transaction would have provided context for the apparent transaction. (*Id.*)

Then, on April 8, 2016, agents conducted surveillance on Brantley, observing him travel as a passenger from the Five Points MARTA station to a hotel in Stockbridge, Georgia. (TT1 Aff. ¶ 98.) Through information obtained from CHS-1, agents learned that Brantley had entered one of the hotel rooms, engaged

---

[33] SA Szabo noted that that at the time of the February 13, 2016 meeting, law enforcement intercepted a series of text messages between Evans and an unknown person over GTT7 providing Evans with a list of the gang members present at the meeting. (TT1 Aff. ¶ 96.)

in a conversation with an unknown individual regarding "a variety of drugs," and may have engaged in a drug transaction.  (*Id.*)  SA Szabo explained, however, that agents could not determine from surveillance, which room Brantley entered or the individual with whom he interacted.  (*Id.*)

SA Szabo also stated that between April 8 and July 26, 2016, agents conducted surveillance of Clark, Riley, and Mitchell.  (TT1 Aff. ¶ 99.)  While agents were able to identify travel patterns and locations that the three gang members frequented, they were not able to determine from surveillance alone the significance of their travel and/or destinations, or what relationship the various individuals have with each location.  (*Id.*)

Physical surveillance also had limited utility, SA Szabo explained, because much of the gang leadership—including individuals allegedly ordering killings—were incarcerated.  (TT1 Aff. ¶ 100.)  He further explained that the "behavior of the TARGET SUBJECTS, the difficulty of watching suspects, and the fact that little is known about other associates working within the organization, collectively exemplify the obstacles law enforcement faces in trying to locate, identify, and follow the illicit activities of the organization."  (*Id.* ¶ 102.)  He asserted that wiretap information from TT1 would "better aid" the investigation and make

surveillance "more successful," and that absent the requested intercepts, "it would be nearly impossible to determine the locations where members meet, the activities that members engage in and the scope of the illegal narcotics and firearms trafficking, wire and bank fraud, violent criminal activity, and other TARGET OFFENSES conducted by members of this organization." (*Id.* ¶¶ 101, 103.)

### vii.   Search Warrants, Consent Searches, Review of Social Media Accounts, and Trash Pulls

SA Szabo stated that search warrants, consent searches, searches of social media, and trash pulls were not a feasible alternative to electronic surveillance, and that executing a search warrant or consent search, in particular, would likely be counterproductive.  (TT1 Aff. ¶ 104.)  Search warrants of "brick and mortar locations" would likely not satisfy the investigatory goals because of the gang's sensitivity to law enforcement surveillance and the fact that gang members compartmentalize their activities.  (*Id.* ¶ 105.)  Executing search warrants would also alert targets of the investigation, compromising the investigation.  (*Id.*)

SA Szabo relayed that agents had reviewed information from social media posts of Clark, Brantley, Mitchell, Riley, and codefendant Tashied Reed, but that their postings did not constitute sufficient evidence to fulfill all of the investigation's goals.  (TT1 Aff. ¶ 106.)  In addition, SA Szabo explained, users of

social media know that their public postings can be reviewed by anyone and that private postings can be obtained by law enforcement with legal process, which rendered it unlikely that posted content would include incriminating information. (*Id.*) SA Szabo stated that obtaining social media posts would assist in meeting the investigatory goals only "when combined with context and more in-depth information provided by intercepted communications." (*Id.*)

Regarding trash pulls, SA Szabo stated that physical surveillance had not shown anyone at any identified residence placing trash in curbside receptacles. (TT1 Aff. ¶ 107.)  In addition, trash pulls would be unlikely to reveal information leading to the identification of gang leadership, the goals of the organization, or provide evidence of the target offenses.  SA Szabo explained that in his experience, gang members rarely dispose of log books, telephones, telephone numbers, or any documents that would expose the identity of fellow gang members.  In addition, any documents with identifying information were usually disfigured or mutilated, making it difficult or impossible to obtain evidence from the documents; but even if not, discarded ledgers "ma[d]e more sense combined with intercepts." (*Id.*)

48

### b.      Probable Cause for TT1

Turning back to the challenges to the TT1 wiretap, Mitchell and Clark [34]

contend that probable cause did not exist to support the issuance of the wiretap

order for TT1 because SA Szabo's affidavit "relies on stale and/or irrelevant

information," and fails to provide support for "any claim of on-going criminal

activity." [Doc. 747 at 14-15; Doc. 779 at 12-13.]  More specifically, they identify

that SA Szabo's affidavit, dated August 2, 2016, refers to intercepted

communications about purported drug transactions, firearms, fraud, and a shooting

from February 2016, and the seizure of Evans's ledger during his transfer to

Gwinnett on February 16, 2016; and that the most recent telephone call summarized

in SA Szabo's affidavit occurred on June 3, 2016, and primarily addressed the need

to raise money for Evans's legal defense and the arrest of an alleged fellow Nine

_____

[34] Again, the government concedes only that Mitchell and Clark have standing to challenge the interception of communications over TT1. [Doc. 873 at 12-13; Doc. 996 at 10-11.]  Regardless, Balcazar and Jackson make identical arguments for the suppression of communications intercepted over TT1. [*See* Doc. 797 at 4-15; Doc. 827 at 5-16.]  Accordingly, even if Balcazar and Jackson had standing to challenge TT1, for the reasons explained in this section, their arguments would likewise fail.

Sartor does not challenge the TT1 wiretap for lack of probable cause. [*See* Docs. 526, 590.]

Trey Gangster member on gun-related charges.  [Doc. 747 at 12-15; Doc. 779 at 12-15.]

The government counters that the information was not in fact stale.  [Doc. 873 at 33; Doc. 996 at 24.]   Although the government acknowledges that SA Szabo's affidavit "relies extensively" on intercepts from February 2016, it argues that the summary of interceptions from February 2016 was necessary background information to explain how and why agents believed that Clark was using TT1 as part of an ongoing RICO conspiracy, and represents merely a part of the probable cause demonstrated in the affidavit.  [Doc. 873 at 33-34; Doc. 996 at 25-26.]  The government identifies facts from the affidavit it contends support probable cause, including:  the jail call from June 3, 2016, which showed that the Nine Trey Gangsters remained an ongoing enterprise at the time, that Clark was one of its leaders, and that Clark was using TT1 to conduct gang business; information from CHS-1 identifying Clark as high-ranking gang leader; and pen registers and toll analysis demonstrating that Clark used TT1 to communicate extensively with alleged gang leaders Riley, Sartor, Mitchell, and Ronald Brantley from June 20 to July 20, 2016, just weeks before the application and order authorizing the wiretap of TT1.  [Doc. 873 at 34-35; Doc. 996 at 25-26.]  The government argues that these

50

additional facts—the pen registers information and toll analysis, in particular—support, refresh, and update the evidence from February 2016 and eliminate problems with staleness.  [Doc. 873 at 35; Doc. 996 at 26.]

As discussed, wiretap orders must be supported by probable cause.  *Nixon*, 918 F.2d at 900.  "Warrant applications based on stale information[, however,] fail to create probable cause that improper conduct is continuing."  *United States v. Grant*, 521 F. App'x 841, 845 (11th Cir. 2013) (citing *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)); *see United States v. Domme*, 753 F. 2d 950 (11th Cir. 1985) ("As with other types of search warrants, the probable cause needed to obtain a wiretap must exist at the time surveillance is authorized.").  "There is no mathematical measure for when freshness fades away and staleness sets in," *United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011), but the Eleventh Circuit has explained:

> When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented.  In this case-by-case determination we may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched.

*United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) (quotations and citations omitted).  Based upon these considerations, "when criminal activity is 'protracted and continuous,' it is more likely that passage of time will not dissipate probable cause; [and] it is reasonable to assume that the activity has continued beyond [the] last dates mentioned and may still be continuing."  *Grant*, 521 F. App'x at 845 (citing *Domme*, 753 F.2d at 953).  Moreover, "[t]ime becomes less significant in the wiretap context, because the evidence sought to be seized is not a tangible object easily destroyed or removed," and thus, "the stale information issue should be construed less rigorously."  *Id.* (quoting *Domme*, 753 F.2d at 953).

Here, "[t]aking a common sense approach to probable cause," *see Domme*, 753 F.2d at 954, the Court readily concludes that SA Szabo presented sufficient information for Judge Ross to find probable cause to believe that Clark and others were engaged in criminal activity, that Clark was continuing to use TT1 in connection with that activity, and that communications related to that activity would be obtained through wiretap surveillance.  SA Szabo relayed the substance of numerous communications about criminal activity that law enforcement intercepted in February 2016; he summarized incriminating information from the ledger recovered from Evans's prison cell that same month; and he provided

information showing that Clark, who held a position of leadership in the Trey Nine Gangsters, and other alleged members of the organization were involved in the distribution of narcotics and firearms, financial fraud, smuggling contraband cell phones into state prisons, and the attempted murder of fellow gang member. It is also reasonable to believe, based on information relayed by SA Szabo, including ongoing telephone records and toll analysis, that the alleged criminal activity continued beyond February 2016, and that Clark remained involved as a leader within the organization, all while using TT1.

In particular, the Court considers the following facts identified by SA Szabo significant to the issue of staleness. The intercepted jail call on June 3, 2016 between Clark and Evans, contrary to Defendants' position, indicated that the Nine Trey Gangster organization remained an ongoing enterprise at that time and that Clark continued to be involved in its operations. (*See* TT1 Aff. ¶¶ 47-49.) Indeed, according to SA Szabo's affidavit, Clark specifically stated that Sartor was attempting to raise money from fellow gang members for Evans's legal defense; Clark and Evans expressed their disagreement with how Messiah May, a high-ranking gang member, was (actively) running the gang in Evans's absence; and the two discussed the recent arrest of Demacion Moore and how Moore might

53

cooperate with law enforcement.  (*Id.* ¶ 47.)  SA Szabo also related that in late February 2016, Clark ceased using his previous phone number, GTT5, and started using TT1 (*id.* ¶¶ 68-71), and that he (Szabo) knew from experience that gang members, drug traffickers, and others engaged in criminal enterprises use cellular telephones to conduct their transactions and that often use multiple phones (*id.* ¶ 4).  Finally, according to a toll analysis during the 21-day period of June 30, 2016 through July 20, 2016, TT1 was in contact with phone numbers used by other suspected gang members, via voice call or text messaging, over 300 times.  (*Id.* ¶¶ 73-76.)  This virtually uninterrupted contact between Clark and alleged high-ranking fellow gang members, viewed in the context of the affidavit as a whole, is sufficient to establish probable cause to believe that TT1 continued to be used in furtherance of gang business after February 2016 until at least late July 2016.

Mitchell and Clark's staleness argument also falls flat given continuous and ongoing nature of the alleged criminal activity.  "As present in this case, where the supporting affidavit paints a picture of continuing conduct, as opposed to an isolated instance of wrongdoing, . . . the passage of time between the last described act and the presentation of the application becomes less significant." *Degaule*, 797 F. Supp. 2d at 1357 (quotation and alteration omitted).  The investigation here

targeted a criminal enterprise whose members were allegedly involved in a vast array of ongoing criminal activity, including racketeering and racketeering conspiracy, fraud schemes, drug and firearm trafficking, and violent crime in aid of racketeering.  (*See* TT1 Aff. ¶ 8; *see also id.* ¶¶ 23-67.)  As discussed above, the extensive communications between TT1 and phone numbers of other suspected gang members, along with Clark and Evans's recorded jail call in June 2016, further demonstrate a continuous chain of related activities that link the events of February 2016 to the time when SA Szabo applied for the wiretap.  Thus, conduct that allegedly occurred in February 2016 (*i.e.,* between five and six months before the court authorized the wiretap of TT1) was not stale and could be used to support a finding of probable cause for the wiretap order.  *See United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000); *United States v. Hooshmand*, 931 F.2d 725, 735 (11th Cir. 1991).

In sum, given that this Court must accord "great deference" to a district judge's probable cause determination, this Court concludes that the totality of the circumstances set forth in SA Szabo's affidavit provided a substantial basis for Judge Ross's probable cause determination.  *See Nixon*, 918 F.2d at 900.

### c. Necessity for TT1

Mitchell and Clark[35] next argue that the application for the wiretap on TT1 failed to establish that law enforcement exhausted traditional investigative techniques.  [Doc. 747 at 6-12; Doc. 779 at 5-10.]  As outlined generally above, Title III requires that wiretap applications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. 2518(1)(c).  "This 'necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed.'"  *United States v. Maxi*, 886 F.3d 1318, 1331 (11th Cir. 2018) (quoting *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986)).  "To show necessity, the 'affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'"  *Id.* at 1331 (quoting *Van Horn*, 789 F.2d at 1496).

---

[35] As with probable cause, Balcazar and Jackson make identical arguments on the issue of necessity.  [*See* Doc. 797 at 4-15; Doc. 827 at 5-16.]  Accordingly, even if Balcazar and Jackson had standing to challenge TT1, for the reasons explained in this section, their arguments would likewise fail.

The Court disagrees with Mitchell and Clark's argument on necessity.  As detailed above, SA Szabo described at length the various investigative procedures that had been tried or considered (including prior wiretaps of other lines, pen registers, trap and trace, analysis of phone records, consensual monitoring, interviews, arrest, subpoenas, physical surveillance, search warrants, consent warrants, social media review, and trash pulls), the limitations associated with each of those procedures, and reasons why certain traditional procedures reasonably appeared to be unlikely to succeed or to be too dangerous.  (TT1 Aff. ¶¶ 79-108.) This is all that was required.  *See* 18 U.S.C. § 2518(1).

Each of the arguments that Mitchell and Clark raise to the contrary are without merit.  In particular, they argue that SA Szabo provided "no explanation for the reason the recorded and monitored jail calls are not sufficient at this stage in the investigation."  [Doc 747 at 8; Doc. 779 at 7.]  To the contrary, it is clear from the affidavit that extensive gang-related activity was taking place outside prison walls, including meetings, alleged drug transactions, and at least one attempted murder.  Although recorded jail calls here undoubtedly valuable to the investigation, "[n]othing in the law requires that the traditional methods be entirely

useless or that the district court force the government to redefine its objectives." *United States v. Allen,* 274 F. App'x 811, 816 (11th Cir. 2008).

Mitchell and Clark also specifically complain that there were "no efforts to use trash pulls, search warrants, grand jury subpoenas" [Doc 747 at 8; Doc. 779 at 7]; however, SA Szabo explained the limitations and problems with each of those techniques. (TT1 Aff. ¶¶ 104-08.) Regarding trash pulls, SA Szabo stated that, based upon physical surveillance, there were no trash receptacles from which a trash pull could be performed, and even if there were, in his experience, documents recovered in trash pulls have limited, if any, use in furthering the goals of the investigation. (*Id.* ¶ 107.) Likewise, he explained that executing search warrants and servicing grand jury proceedings would likely compromise the investigation and that it was unlikely that grand jury testimony would appreciably advance the goals of the investigation. (*Id.* ¶¶ 105.)

Further, Mitchell and Clark's reliance on *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001) and *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005), two cases in which the Ninth Circuit held that the government failed to establish the necessity requirement, is misplaced. In *Blackmon*, the wiretap affidavit contained material misstatements and omissions, which when excised, left

only "boilerplate conclusions that merely describe inherent limitation of normal investigative procedures" that would be true in most narcotics investigations.  274 F.3d at 1210.  Here, by contrast, Mitchell and Clark do not contend, and have certainly made no showing, that SA Szabo's affidavit contains material misstatements or omissions.  Nor can it be said that the affidavit consists of boilerplate conclusions about inherent limitations in traditional investigative techniques.

In *Gonzalez*, meanwhile, the government obtained a wiretap of a bus company being investigated for smuggling undocumented migrants.  412 F.3d at 1106.  The affidavit supporting the application stated that before applying for a wiretap, law enforcement used only five days' worth of pen register and trap-and-trace analysis, one failed attempt to physically conduct surveillance, and a vague statement that an attempt was made to infiltrate an unspecified office location.  412 F.3d at 1112-13.  Those efforts, the court reasoned, were too cursory, and the government had failed to show that other investigative procedures were not potentially productive—essentially "side stepp[ing] its responsibility to use promising traditional techniques when it began [its] investigat[ion.]"  *Id.* at 1113-14.  In the case at bar, by contrast, the law enforcement had used multiple

investigative techniques for many months, with varying degrees of success, and SA Szabo provided a detailed explanation regarding the limitations and risks of other traditional techniques.

Clark and Mitchell also argue, albeit in passing, that the investigatory goals were so broadly defined and expansive that it was a foregone conclusion that a reviewing judge would conclude that traditional methods of investigation were insufficient and that wiretaps would be necessary.[36]  [Doc. 747 at 9-10; Doc. 779 at 7-8.]  In his affidavit supporting the application for TT1, SA Szabo described the investigatory goals as follows:

> It is the goal of this investigation to disrupt and dismantle the instant gang.  More precisely, I believe that the wiretap and electronic surveillance sought herein will further the current goals of this investigation in that they will help to:  disrupt narcotics trafficking carried out by members of the gang; disrupt or prevent the illegal distribution of firearms carried out by members of the gang; disrupt or prevent any introduction of contraband to any prison or detention facility by members of the gang; disrupt, prevent or solve any acts of violence committed by members of this gang against rival gang members, other members of the gang itself, or innocent citizens; and to disrupt and[/]or prevent any acts of wire fraud, bank fraud or aggravated identity theft being committed by members of the gang which result in the loss of income or funds from innocent persons or

---

[36] Sartor makes a similar argument as to the purported overbreadth of the investigatory objectives contained in SA Szabo's affidavit.  [*See* Doc. 526 at 4-6.]  Even if Sartor had standing, his argument would fail for the same reasons as will be discussed more fully below.

corporations.   The interception of wire and electronic communications sought herein will also help to further the goals of this investigation in that they will continue to help to reveal:  (a) the nature, extent, methods, and identities of the gang and associates of the TARGET SUBJECTS and others; (b) the identities, locations, and roles of the TARGET SUBJECTS, accomplices, aiders and abettors, co-conspirators, and other participants in their illegal activities; (c) the distribution and transfer of funds and contraband involved in these illegal activities; (d) the existence and location of records related to the TARGET SUBJECTS' illegal activities; (e) the location and source of resources used to finance the illegal activities; (f) the location and disposition of the proceeds from those activities; and (g) the locations and items (including other telephones) that these individuals are using to further their unlawful activities . . . .

(TT1 Aff. ¶ 11.)[37]

"The necessity of a wiretap order is evaluated in light of the scope of the goals and the course of the investigation." *Flores*, 2007 WL 2904109, *5.  Here, even though the goals of the investigation are broadly defined, the Court is not persuaded that "a broad investigation with ambitious goals is unacceptable under [Title III]." *See United States v. Najera-Perez*, No. 1:12-CR-232-CAP-LTW, 2014 WL 888651, at *12 (N.D. Ga. Mar. 6, 2014), *adopted*, *id. at* *1.  Each of the investigative goals that SA Szabo identified is designed with the goal of penetrating

---

[37] SA Szabo's affidavits supporting the later applications identify the same investigatory goals.  (*See* Aff. of Paul Szabo dated Sept. 7, 2016 ("TT2 Aff.") ¶ 11 [Doc. 877 Ex. 7 and Doc. 1026-1 at 60-170]; Aff. of Paul Szabo dated Oct. 31, 2016 ("TT3 Aff.") ¶ 11 [Doc. 877 Ex. 9 and Doc. 1026 at 16-136].)

and determining the entire scope of the alleged criminal enterprise.  SA Szabo identified numerous target offenses that law enforcement was investigating, along with evidence that the offenses were ongoing, including racketeering and racketeering conspiracy; drug and firearms trafficking, financial fraud; and violent crimes and murder.  He also identified numerous target subjects, many of whom were not known to law enforcement.   It is therefore appropriate that the investigation would seek evidence relating to, among other things, the nature, extent, methods, and identities of gang members and associates; the identity, location, and roles of the target subjects and others acting in concert with them; how contraband and funds were being distributed and transferred; the location and source of resources used to finance the alleged criminal activity; and the location of evidence and records relating to the activities.  It is also entirely appropriate for law enforcement to have as its goal the disruption of the enterprise.

This Court has concluded that similarly ambitious investigatory goals in a gang investigation provided no basis to second-guess the issuing judges' necessity findings.  In *United States v. Pasby*, this Court found that the following broad description of investigative goals did not render a wiretap order invalid for want of necessity:

(a) the nature, extent, methods, and identities of the gang and associates of the TARGET SUBJECTS and others;

(b) the identities, locations, and roles of the TARGET SUBJECTS, accomplices, aiders and abettors, co-conspirators, and other participants in their illegal activities, including possible perpetrators of a known threat against law enforcement and extortion of a United States citizen;

(c) the distribution and transfer of funds and contraband involved in these illegal activities;

(d) the existence and location of records related to the TARGET SUBJECTS' illegal activities;

(e) the location and source of resources used to finance their illegal activities;

(f) the location and disposition of the proceeds from those activities; and

(g) the locations and items (including other telephones) that these individuals are using to further their unlawful activities . . . .

No. 1:16-CR-145-TWT-JKL-22, 2017 WL 10402560, at *5 (N.D. Ga. Oct. 4, 2017), *report and recommendation adopted*, 2018 WL 4953235 (N.D. Ga. Oct. 12, 2018).

Other judges on this Court have reached similar conclusions.  In *Najera-Perez*, the court denied a motion to suppress in which the defendant challenged the definition of the investigatory goals as overbroad.  In that case, the goals included:

(1) the identities of all of the individuals in the drug trafficking organization; (2) the current locations of the target subjects and their

unidentified accomplices; (3) the present operations and scope of the drug trafficking activities of the organization in Atlanta and elsewhere; (4) the methods of importing and transporting narcotics from Mexico through Texas and/or California to Atlanta; (5) the methods of disposing of the bulk currency proceeds of drug trafficking and of laundering money to transport to Mexico drug proceeds earned by operatives in the United States; (6) the current significant customers of the organization in Atlanta and elsewhere, Mexican sources of supply, local distributors, and transportation operatives; (7) the locations where members of the organization store their narcotics and/or drug proceeds; and (8) dismantling the organization by convicting the highest level supervisors and leaders and seizing the assets of the organization and its members.

*Najera-Perez*, 2014 WL 888651, at \*12. Similarly, in *Flores*, a case involving the investigation of a drug conspiracy, the wiretap applications and affidavits stated that the goal of the investigation was:

(1) the identification of all participants, (2) the identification of all locations utilized by the participants, (3) the identification of methods of operation, including importation, transportation, storage and distribution of drugs, for the trafficking organizations, (4) the identification of the methods of collection and disbursement of drug proceeds, (5) the identification of customers and the sources of supply in Mexico, and (6) the dismantling of the organizations, including the identification and seizure of assets.

*Flores*, 2007 WL 2904109, at \*28. And in *United States v. Aguirre-Benitez*, a drug trafficking case,

[t]he affidavits for the federal wiretaps specified that the investigation aimed to dismantle the entire drug trafficking organization, including ascertaining: (a) the full nature, extent and methods of the drug trafficking, importation, transportation, and

> distribution business; (b) the administration, control, and management of the drug trafficking business; (c) the identities and roles of accomplices, including the sources of supply; (d) the manner and means of distribution of the drugs, as well the collection of the profits; (e) the existence and location of drug records and proceeds; (f) the location and source of resources used to finance the illegal activities; and (g) the location and instrumentalities used to further these activities.

*Aguirre-Benitez*, 2017 WL 9477737, at *14.

SA Szabo's affidavits, as well as the superseding indictment in this case, allege that the Nine Trey Gangster and Firaq Line are sophisticated enterprises with numerous members engaged in criminal activity ranging from financial fraud to murder. As in *Pasby*, this Court has no hesitation in concluding that the investigative goals set out in SA Szabo's affidavits are appropriate and that the definition of those goals provides no basis to second-guess Judge Ross's, Judge Story's, or Judge Cohen's orders approving the wiretaps. According, Clark and Mitchell's arguments on the purported overbreadth of the investigatory goals outlined by SA Szabo are without merit.

### d.    Sealing Recordings from TT1 After Expiration of Initial Interception Order

Defendants Mitchell and Clark finally contend that the communications intercepted over TT1 should be suppressed because the Court did not timely seal the communications in accordance with 18 U.S.C. § 2518(8)(a).  [Doc. 747 at 5-6;

Doc. 779 at 4-5.]   The government responds that the Court timely sealed the interceptions because it ordered the interceptions to be sealed within one business day of the expiration of the interception order.  [Doc. 873 at 16-17; Doc. 996 at 13.] The government is correct.

As discussed, 18 U.S.C. § 2518(8)(a) requires that intercepted communications be sealed "immediately" upon the expiration of the interception order.  The Eleventh Circuit has explained that recordings are sealed in accordance with the immediacy requirement if they are sealed within one or two days of the expiration of the period of the order authorizing the wiretap.  *Matthews*, 431 F.3d at 1307 (11th Cir. 2005).  Intervening weekends and legal holidays need not be counted in determining whether sealing orders were filed immediately on the wiretap's expiration. *See United States v. Rodrigues*, 850 F.3d 1, 12 (1st Cir. 2017); *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994); *United States v. Riley*, No. 2:18-CR-50, 2019 WL 2093248, at *9 (S.D. Ga. Apr. 19, 2019), *report and recommendation adopted*, 2019 WL 2090686 (S.D. Ga. May 13, 2019); *Ortega-Estrada*, 2008 WL 4716949, at *11; *United States v. Deas*, No. 3:07CR73 (CFD), 2008 WL 4642636, at *3 (D. Conn. Oct. 21, 2008); *United States v. Bennett*, 825 F. Supp. 1512, 1527 (D. Colo. 1993).

Here, the initial interception over TT1 ceased on September 2, 2016, a Friday.  The next business day was Tuesday, September 6, 2016, as Monday, September 5, 2016 was Labor Day.  The sealing order was signed and the recordings were sealed on Tuesday, September 6, 2016, and the order was stamped filed on September 7, 2016.  [Doc. 877 Ex. 6 and Doc. 1026-1 at 54-59]  Since just one business day passed between the expiration of the interception order for TT1 and the date of sealing, the Court readily concludes that the recordings obtained from TT1 were timely sealed.

### 2.   TT2/Renewal of TT1

#### a.   Summary of SA Szabo's Affidavit for TT1 Renewal/TT2

In his affidavit in support of his application for a wiretap of TT2 and to renew the wiretap of TT1, SA Szabo expanded on information that he relayed in his affidavit supporting the application for the TT1 wiretap.  (*See* TT2 Aff. [Doc. 877 Ex. 7 and Doc. 1026-1 at 60-170].)  Similar to his earlier affidavits, SA Szabo submitted that there was probable cause to believe that communications over TT1 and TT2 would yield evidence of numerous offenses, including racketeering and racketeering conspiracy, distribution of and possession with intent to distribute controlled substances, unlawful use of communications facilities in committing or

facilitating the commission of drug trafficking offenses, conspiracy and attempt to distribute and possess with intent to distribute controlled substances, violent crime in aid of racketeering, firearms trafficking, and aiding and abetting those offenses. (*Id.* ¶ 8.) He also identified 56 known target subjects, and described the objectives of the investigation. (*Id.* ¶¶ 9, 11-13.) He additionally summarized prior applications for interception, including the state wiretaps and the federal wiretap on TT1. (*Id.* ¶¶ 18-23.) Significantly, he also relayed that the telephone number associated with TT2 was activated on February 23, 2016, and that a review of T-Mobile subscriber records revealed that the predecessor number for the account associated with TT2 was 404-207-9828, Mitchell's previously-intercepted phone number, and that the cellular handset's international mobile subscriber identity and device numbers stayed the same. (*Id.* ¶ 25.) Thus, SA Szabo explained, it appeared that Mitchell had changed the phone number associated with his account to TT2, but continued to use the same device. (*Id.*)

Next, in a section of the affidavit titled "Statement of Probable Cause," SA Szabo provided information concerning the background and structure of the Nine Trey Gangster Bloods, the gang's presence within Georgia prisons and "on the street," and the leadership structure of the Firaq Line. (TT2 Aff. ¶¶ 27-48.) SA

68

Szabo also provided an extensive summary of communications intercepted over TT1, which revealed that TT1 and TT2 were allegedly being used to communicate about a wide range of gang-related activity, including drug transactions (both in and outside prison), gang meetings, potential robberies, and firearms trafficking. (*Id.* ¶¶ 51-72.)  SA Szabo also repeated his summary of intercepted calls over the state wiretaps, which he had included in his affidavit in support of the initial authorization of TT1.  (*Id.* ¶¶ 73-76.)  SA Szabo additionally summarized toll records showing that TT1 and TT2 had contact with each other over 50 times from August 1, 2016 through August 22, 2016, as well as other telephone numbers used by alleged gang members during that period.  (*Id.* ¶¶ 77-81.)

Next, over the span of 25 pages, SA Szabo again discussed the use and limitations of pen registers and toll analysis; confidential sources and undercover agents; consensual monitoring; witness interviews, arrest, grand jury subpoenas; physical and electronic surveillance; a pole camera; search warrants; consent searches; review of social media accounts; and trash pulls.  (TT2 Aff. ¶¶ 82-120.) In addition to information he relayed in his prior affidavit, SA Szabo stated that agents were only able to make advancements in the investigation possible though the interception of TT1, including identifying the phone number allegedly used by

69

Defendant Sartor.  (*Id.* ¶ 89.)  Interception of TT1 also enabled agents to understand Clark's connection with different levels of the gang and revealed that the target subjects are "extremely concerned about cooperators."  (*Id.* ¶¶ 92, 94.)  SA Szabo relayed that agents had used grand jury subpoenas and administrative subpoenas; however, "the information [was] very singular in nature and often out-of-date." (*Id.* ¶ 99.)  Surveillance and interception of TT1 also revealed that the location of the "Billy Spot," which appeared to be Mitchell's primary residence, was used for meetings and a base for drug trafficking activity.  (*Id.* ¶ 109.)  Intercepted communications additionally showed that the target subjects were "particularly conscious of law enforcement," and SA Szabo summarized two intercepted conversations over TT1 in which Clark and Mitchell each expressed concern about law enforcement.  (*Id.* ¶ 110.)  SA Szabo also detailed that at or near the start of the interception of TT1, agents installed a pole camera near Clark's residence, which showed the people and vehicles coming to and from the location.  (*Id.* ¶ 115.)  But only with interception, SA Szabo explained, would agents be able to understand the context of the information provided by the pole camera.  (*Id.*)

### b.      Probable Cause for TT1 Renewal/TT2

Clark, Mitchell, and Balcazar challenge the renewal of the wiretap of TT1 and the wiretap of TT2, and their challenge is, for the most part, based on the same

arguments they raise as to the initial application for the TT1 wiretap.  [*See* Doc. 747 at 16-18, 21-23; Doc. 779 at 15-16, 19-20; Doc. 797 at 15-16,[38] 19-22.][39] Defendants point out that SA Szabo's affidavit refers to the ledger seized from Evans's cell in February 2016 and communications that were intercepted in February 2016—information that Defendants contend to be stale—as well as calls intercepted between August 4 and 31, 2016—communications the Defendants assert the government unlawfully intercepted.  [Doc. 747 at 22; Doc. 779 at 20; Doc. 797 at 19-20.]  Defendants also assert that "the September 7, 2016 application contains much of the same boilerplate language that was included in the initial application with very little new information to support the continued Fourth

_____

[38] Balcazar's perfected motion [Doc. 797] is not paginated; thus, the Court refers to specific page numbers using the page numbering automatically generated by CM/ECF.

[39] Again, the government concedes that Mitchell, Balcazar, and Clark have standing to challenge the interception over TT1 during the renewal period, September 7, 2016 to October 6, 2016.  [Doc. 873 at 12-13; Doc. 996 at 10-11.] The government also concedes that Mitchell has standing to challenge the interception of communication over TT2.  [Doc. 873 at 13; Doc. 996 at 11.] Because the order authorizing the renewal of the wiretap on TT1 and the wiretap on TT2 was based on the same application, the Court considers the challenges to those wiretaps together.  Also, as noted above, Jackson makes an identical argument in support of his motion to suppress communications intercepted over TT1 and TT2, [*see* Doc. 827 at 18-22], so even if he could establish standing, his arguments would fail.

Amendment invasion of so[] many people."  [Doc. 747 at 22-23; Doc. 779 at 20; Doc. 797 at 20.]

For the same reasons that the Court rejects Defendants' challenge to TT1, including the argument that SA Szabo impermissibly relied on stale information, Defendants challenge to the renewal of TT1 and TT2 also fails.  The Court also disagrees that SA Szabo's affidavit supporting the application contains an impermissible amount of "boilerplate" and "very little new information."  To the contrary, SA Szabo's affidavit provided a significant amount of new information, including a detailed, 14-page summary of numerous calls and text messages that agents intercepted from August 4, 2016 to August 31, 2016, in which Clark (over TT1), Mitchell (over TT2), and others allegedly discussed criminal gang activity including trafficking of gun and drugs, gang meetings, and planned robberies. (TT2 Aff. ¶¶ 51-72.)  The substance and frequency of those calls reasonably indicates that TT1 and TT2 were being used, and would continue to be used, in furtherance of a wide variety of criminal activity.  Accordingly, the Court finds that Defendants' probable cause challenge to the renewal of TT1 and TT2 are without merit, and that there is a substantial basis for Judge Story's finding of probable cause.

### c.  Necessity for TT1 Renewal/TT2

Clark, Mitchell, and Balcazar similarly argue that SA Szabo's affidavit in support of the TT1 renewal and TT2 wiretap application failed to meet the necessity requirements for the same reasons as did the initial application for TT1.  [Doc.747 at 18-21; Doc. 779 at 17-19; Doc. 797 at 16-19.]  These arguments are essentially a regurgitation of the arguments that the Court has already rejected, and ignores the fact that SA Szabo's affidavit provides additional information concerning law enforcement's use investigation techniques.  For example, SA Szabo discusses at length certain information that law enforcement was able to obtain only through by intercepting communications over TT1.  (*See* TT2 Aff. ¶¶ 89, 92, 99, 110, 111, 112, 115.)  Accordingly, those Defendants' necessity challenge to the TT1 renewal and TT2 wiretaps fails.

### 3.  TT3

### a.  Summary of SA Szabo's Affidavit Supporting the Application for the TT3 Wiretap

On October 31, 2016, SA Szabo supplied another affidavit in support of an application for an order authorizing the interception of communications over TT3 (TT3 Aff. [Doc. 877 Ex. 9 and Doc. 1026 at 16-136]), a phone believed to have been used by codefendant Riley (*id.* ¶ 7).  Similar to his earlier affidavits, SA Szabo

submitted that there was probable cause to believe that communications over TT3 would yield evidence of numerous offenses, including racketeering and racketeering conspiracy, distribution of and possession with intent to distribute controlled substances, unlawful use of communications facilities in committing or facilitating the commission of drug trafficking offenses, conspiracy and attempt to distribute and possess with intent to distribute controlled substances, violent crime in aid of racketeering, firearms trafficking, and aiding and abetting those offenses. (*Id.* ¶ 8.)  He also identified 88 known target subjects, and described the objectives of the investigation.  (*Id.* ¶¶ 9, 11-13.)  He additionally summarized prior applications for interception, including the state wiretaps, the federal wiretaps on TT1 and TT2, and two additional federal wiretaps that the government obtained from Chief United States District Judge James C. Dever III, of the United States District Court for the Eastern District of North Carolina, on September 23 and October 13, 2016.  (*Id.* ¶¶ 18-26.)

Next, SA Szabo stated that the telephone number associated with TT3 was activated on November 30, 2015.  (TT3 Aff. ¶ 27.)  Subscriber records from T-Mobile indicated that the subscriber name associated with TT3 was "Joseph B.

74

Riley", and that Riley's birthdate and social security number were also associated with the number. (*Id.*)

SA Szabo then relayed facts to establish probable cause. (TT3 Aff. ¶¶ 28-91.) As in his earlier wiretap affidavits, he described the history and organization of the Nine Trey Gangster organization and its involvement in Georgia and the Southeast. (*Id.* ¶¶28-51.) Then, over the span of nearly 20 pages, SA Szabo summarized telephone calls and text messages that agents intercepted following the approval of TT2 and the renewal of TT1. (*Id.* ¶¶ 52-85.) The communications included:

- an intercepted telephone call on September 19, 2016 between Clark (using TT1) and Raekwon Williams in which Clark allegedly offered to pay Williams to shoot up a residence (*id.* ¶ 52);

- an intercepted telephone call on September 20, 2016, between Clark (using TT1) and Riley (using TT3) in which they discussed posting bond for two alleged fellow gang members who had recently been arrested and a potential gun sale (*id.* ¶ 53-54);

- an intercepted telephone later in the evening on September 20, 2016, in which Riley (using TT3) told Mitchell (using TT2) discussed

75

posting bond for fellow gang members and a potential drug transaction (*id.* ¶ 55); and

- an intercepted telephone call on September 21, 2016, between Clark (using TT1) and Demario Ridley concerning a potential drug transaction (*id.* ¶ 56).

SA Szabo also summarized a series of intercepted telephone calls and text messages beginning on September 24, 2016, which revealed that Mitchell's residence and alleged drug distribution spot had been burglarized and at least $5,000 had been stolen while he was allegedly attending a gang meeting, and that Mitchell instructed codefendant Cetera Bowles-Griffin to move all the remaining drugs, firearms, and money to safe location.  (TT3 Aff. ¶ 57.)  From those calls, agents learned that Mitchell suspected that the burglary was an "inside job" and believed that fellow gang member Yahsell Gable was involved.  (*Id.* ¶¶ 57-59.)  On September 25, 2016, Mitchell was intercepted telling codefendant Raewkon Williams that he would shoot and kill Gable, and making arrangements for Williams to pick Mitchell up at the Billy Spot, along with the specific address in Atlanta, Georgia.  (*Id.* ¶ 60.)  Later that same evening Mitchell allegedly told Bowles-Griffin that he would have to kill Gable and had arranged with Williams

76

to confront Gable at Gable's residence.  (*Id.* ¶ 61.)  According to SA Szabo, Mitchell speculated that since Gable was at a residence with other people, including Gable's mother, he (Mitchell) was going to have to kill Gable's mother and possible others present at the residence.  (*Id.*)  SA Szabo relayed that FBI surveillance observed Williams and Mitchell depart the "Billy Spot," and head towards Gable's location.  (*Id.* ¶ 62.)  To prevent the shooting and potential murder, the FBI coordinated with the Atlanta Police Department to stop Mitchell and Williams's vehicle.  Officers discovered that Mitchell, a convicted felon, and Williams were in possession of a loaded handgun.  Officers also found a "distribution quantity" of marijuana and a drug scale in the vehicle.  Mitchell was arrested, and along with his arrest the interception of TT2 (Mitchell's phone) ended.  (*Id.*)

SA Szabo then explained that shortly after the arrest, Clark (using TT1) was intercepted over a telephone call with codefendant Alfonzo Nalls attempting to coordinate the removal of items from the "Billy Spot" that they believed to be incriminating in nature.  (TT3 Aff. ¶ 63.)  Nalls then arranged for specific items to be removed from the "Billy Spot" and delivered to Clark.  (*Id.* ¶ 64.)  After Clark allegedly received the items, he and Sartor were intercepted on a call discussing controlled substances removed from the "Billy Spot."  (*Id.*)  Later in the evening

of September 25, 2016, Clark was intercepted on a call with codefendant Kierra Maheia discussing drug money allegedly belonging to Sartor that Maheia was maintaining in her possession following Mitchells' arrest.  (*Id.* ¶ 65.)  During the call, Clark purportedly instructed Maheia to keep the money until the following day.  (*Id.*)

SA Szabo next relayed that the following day, September 26, 2016, Clark (using TT1) and Riley (using TT3) were intercepted discussing the arrest of Mitchell and Williams and the situation involving Gable.  (TT3 Aff. ¶ 66.)  They discussed that codefendant Tashied Reed had confronted Gable about the stolen money earlier that morning, and Gable had admitted having the money.  (*Id.*)  The money was reportedly at a residence in the Mechanicsville neighborhood of Atlanta controlled by a rival gang with which Gable was associated. The rival gang members were refusing to return the money, so Reed wanted the assistance of Trey Nine gang members to take the money forcibly.  (*Id.*)  During the call, Clark took a "waiting" call from codefendant Brandon Asberry, who explained that he was in Norcross and needed to "go get [Reed]."  (*Id.* ¶ 67.)  Clark instructed Asberry to take an assault weapon with him when he went to get Reed, and Asberry agreed. (*Id.*)  Clark then returned to the call with Riley, and they discussed Asberry's

78

positive value as a member of the gang.  (*Id.* ¶ 68.)  In a subsequent calls and text messages, Clark and Riley continued to discuss Gable's theft of the money and made arrangements with fellow gang members to coordinate an attack on the rival gang at the residence.  (*Id.* ¶¶ 69-74.)

SA Szabo stated that in response to the intercepted communications, the FBI established surveillance near the "Billy Spot."  (TT3 Aff. ¶ 76.)  Agents observed Bowles-Griffin arrive outside the location, driving a white Chevrolet Cavalier. They also observed Nalls exit the location carrying a suspected firearm wrapped in a black blanket, which he placed in the rear passenger side of the Cavalier.  (*Id.*) Bowles-Griffin then departed the location and traveled in the direction of Mechanicsville at a high rate of speed.  (*Id.*)  In a subsequent intercepted call between Clark and Reed, Clark asked Reed about a location where other members of the gang could meet with Reed (and others) to provide assistance with the attack. (*Id.* ¶ 77.)

SA Szabo relayed that to thwart the pending attack, FBI surveillance and marked APD patrol cars located Bowles-Griffin's Cavalier, which had been joined by a black Cadillac CTS.  (TT3 Aff. ¶ 78.)  The cars were traveling in tandem and were occupied by a total of five individuals.  Law enforcement stopped both

vehicles.  Bowles-Griffin and Reed were found in the Cavalier, and an AK-47-type assault weapon was found in the rear of the car, wrapped in a blanket.  Asberry, codefendant Wajzim Reed, and another gang member were in the Cadillac.  An assault rifle with a red bandana tied around the barrel of the gun was recovered from the vehicle.  All five individuals were arrested and charged by APD with conspiracy to commit murder and participation in criminal street gang activity. (*Id.*)

SA Szabo summarized intercepted communications between September 30 and October 1, 2016, which revealed that Clark brokered a two-pound methamphetamine transaction on behalf of Sartor (who was incarcerated).  (TT3 ¶¶ 79-83.)  FBI agents conducting surveillance ultimately observed the purported transaction take place.  (*Id.* ¶¶ 85-86.)

SA Szabo relayed that toll records showed that from September 28 through October 18, 2016, TT3 had contact with phone numbers used by suspected gang members over 350 times.  (TT3 Aff. ¶¶ 86-90.)

In a section of his affidavit titled "Need for Wiretap and Electronic Interceptions and Utility of Alternative Investigative Means," SA Szabo provided information supporting his belief that a wiretap of TT3 was necessary to

accomplish the objectives of the investigation and again explain why traditional methods of investigation would not work to accomplish those goals.  (TT3 Aff. ¶¶ 91-144.)  SA Szabo discussed wiretap interceptions from the current and related investigations;  pen registers and telephone records;  confidential informants, cooperating sources, and undercover agents; consensual monitoring; interviews, arrests, and grand jury subpoenas; physical and electronic surveillance; and search warrants, consent searches, review of social media accounts, and trash pulls.  (*Id.* ¶¶ 93-144.)

### b.    Probable Cause for TT3

Mitchell and Jackson argue that probable cause did not support the issuance of the wiretap authorization order for TT3.  They contend that SA Szabo's affidavit is based "on a long statement of probable cause that basically recites the same information as the initial order" and that SA Szabo again improperly relied on stale information.  [Doc. 779 at 23-24; 827 at 25-26.]  As discussed above, Mitchell and Jackson lack standing to challenge the interceptions over TT3, so their challenge to TT3 fails for that basis.  But even if they could establish standing, the Court would reject their arguments.  SA Szabo's affidavit in support of TT3 contains a wealth of new information that law enforcement obtained after September 7, 2016 wiretap authorization.  SA Szabo provided detailed summaries of communications

81

among suspected gang members, including Riley, Clark, Mitchell, and Bowles-Griffin about, *inter alia*, collecting money to fund the payment of bond for fellow gang members, drug transactions, firearms, and, significantly, a plan to murder a rival gang member, his mother, and others for purportedly stealing money from Mitchell. (TT3 Aff. ¶¶ 52-85.)   SA Szabo summarized at least eight communications that involving TT3.  (*See, e.g., id.* ¶¶ 53-54 (discussing bonding out fellow gang members and the sale of a gun), 55 (discussing potential drug transaction), 58 (discussing theft of money from Mitchell's residence), 66-70 (discussing plans to retaliate against a rival gang member and obtain weapons), 72-75 (same).)   A toll analysis also showed Riley's near-constant use of TT3 to communicate with other suspected gang members from September 28, 2016 to October 18, 2016.  (*Id.* ¶¶ 86-90.)  Considering the totality of the circumstances, the Court finds that SA Szabo's affidavit sufficiently established probable cause to believe that multiple individuals were engaged in a wide range of criminal offenses, that communications concerning those offenses would be obtained through the use of a wiretap on TT3, and that TT3 was being used in connection with the offenses.

### c.     Necessity for TT3

Sartor, Mitchell, and Jackson also contend that the application for TT3 failed to establish necessity.  [Doc. 526 at 6; Doc. 779 at 21-23; Doc. 827 at 22-25.]  Again,

the Defendants lack standing to challenge TT3; however, even if they could establish standing, their arguments are without merit.

As discussed above, SA Szabo discussed over the span of 54 paragraphs the bases for the government's belief that a wiretap over TT3 was necessary.  Among other things, he discussed the previously authorized wiretaps, and gave detailed examples of information that agents learned through intercepted communications. He also summarized investigative leads that agents developed and why an additional wiretap was necessary to meet the goals of the investigation.  He discussed use and limitations of pen registers and toll analysis, as well as the challenges to using confidential informants, cooperating sources, undercover agents, and consensual monitoring.  SA Szabo also discussed law enforcement's challenges with using interview, arrests, grand jury subpoenas, and financial investigations.

Significantly, SA Szabo summarized intercepted communication in which Mitchell expressed concern about gang members he suspected were cooperating with law enforcement and other intercepted communications revealing the Firaq Line's "pattern of strict control over its members."  (*See* TT3 Aff. ¶¶ 110-111.)  He also specifically relayed that following the arrests on September 25 and 26, 2016,

83

law enforcement gave several target subjects the opportunity to cooperate, and they either refused or lied.  (*See id.* ¶ 114.)  He additionally included a lengthy discussion of the use and limitation of physical and electronic surveillance, and provided examples of information that law enforcement learned only by virtue of being able to intercept communications concurrently with surveillance. (*See, e.g., id.* ¶¶ 129-131.)

Other examples of the sufficiency of SA Szabo's affidavit abound; however, the Court need not belabor the point further.  At bottom, SA Szabo's affidavit in support of TT3—like his two previous affidavits—contained detailed facts particular to the then-current investigation and exhaustively explained why interception of TT3 was necessary.  Accordingly, the Court finds that even if Sartor, Mitchell, and Jackson had standing to challenge the interception of communications over TT3, they have not demonstrated that SA Szabo's affidavit supporting the application for the TT3 wiretap failed to show necessity.

### C.    Good Faith

Beyond the arguments addressed above, the government also contends that even if the Court were to conclude that SA Szabo's affidavits failed to establish probable cause, communications obtained pursuant to the orders should not be

suppressed under the good faith exception to the exclusionary rule.  [Doc. 873 at

38-39; Doc. 996 at 28-30.]  Defendants do not respond to this argument.[40]

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court recognized

the good faith exception to the exclusionary rule for searches that are conducted

pursuant to warrants.  Observing that the purpose of the exclusionary rule is to deter

unlawful police conduct, the Court found that this purpose would not be served,

and the rule should not be applied, when a law enforcement officer, acting with

objective good faith, has obtained a search warrant from a judge and acted within

its scope.  *See Leon*, 468 U.S. at 920-21.  Nonetheless, the *Leon* Court noted four

situations in which suppression would still be appropriate:  (1) when the judicial

officer issues a warrant on a deliberately or recklessly false affidavit; (2) when the

judicial officer wholly abandons his judicial role; (3) when a warrant is issued on

an affidavit so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable; or (4) when a warrant is so facially deficient that

an officer could not reasonably presume it to be valid.  *Id.* at 923.  The Eleventh

---

[40] The government makes an alternative argument under the good faith
exception to the exclusionary rule only with respect to Defendants' probable cause
arguments and not any other alleged deficiency (such as necessity).  Since the
government limits its discussion of the *Leon* exception to the probable cause
finding, the Court does the same.

Circuit has applied the good faith exception to wiretap applications and orders. *See United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988); *see also United States v. Acosta*, 807 F. Supp. 2d 1154, 1248 ("[T]he good faith exception to the exclusionary rule applies to wiretap applications and orders."); *see also Aguirre-Benitez*, 2017 WL 9477737, at *16-17 (applying good-faith exception to the exclusionary rule in wiretap context); *Flores*, 2007 WL 2904109, at *36-37 (same).

Defendants have not presented any arguments to why the good faith exception would not apply. Defendants do not assert, much less present evidence, that SA Szabo's affidavits were "deliberately or recklessly false," that any of the issuing judges wholly abandoned their judicial roles, or that the wiretap orders were facially deficient. Nor do any Defendants advance any argument that the wiretaps were so lacking in probable cause as to bar application of the good faith exception, and for the reasons discussed in detail above, the Court would reject such an argument. Considering the totality of the circumstances, the Court readily concludes that even if SA Szabo's affidavits failed to establish probable cause, the affidavits were no so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Thus, the Court concludes that Defendants'

86

motions to suppress based on the purported lack of probable cause fails on this additional basis.

Based the foregoing reasons, then, it is recommended that Defendants' motions to suppress as they relate to the federal wiretaps be **DENIED**.

## V.    CONCLUSION

For all the reasons explained above, the Court **RECOMMENDS** Defendants' motions to suppress wiretap evidence [Docs. 526, 590, 607, 702, 747, 779, 797, 827] be **DENIED**.

There are no further pretrial matters pending for Defendant Khajavius Mitchell, and the Court has not been advised of any impediment to the scheduling of a trial as to him.   Accordingly, this matter as to Defendant Mitchell (1) is **CERTIFIED READY FOR TRIAL**.[41]

**IT IS SO RECOMMENDED** this 12th day of July, 2019.

_____
JOHN K. LARKINS III
United States Magistrate Judge

_____

[41] Since matters pertaining to Mitchell's codefendants remain pending before the undersigned, the District Court is not required to place his case on the trial calendar at this time.  18 U.S.C. § 3161(h)(6).